**[J-3-2014]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 680 CAP<br>:<br>: Appeal from the Judgment of Sentence<br>: entered on 10/04/2012* (post-sentence<br>: motions denied 02/13/2013) in the Court of<br>: Common Pleas Criminal Division of Adams<br>: County at No. CP-01-CR-0001180-2010.<br>:<br>: *The Trial Court entered an order granting<br>: motion to reinstate appeal rights nunc pro<br>: tunc on 04/16/2013.<br>:<br>: ARGUED: March 11, 2014<br>: |
| Appellee | |
| v. | |
| CHRISTOPHER LYNN JOHNSON, | |
| Appellant | |

**OPINION ANNOUNCING THE JUDGMENT OF THE COURT**

**MR. JUSTICE STEVENS**                    **DECIDED:   December 30, 2014**

This is a direct appeal from the judgment of sentence of death following the conviction of Appellant Christopher Lynn Johnson ("Appellant") on one count of first-degree murder[1] and related charges[2] entered in the Adams County Court of Common Pleas.   For the following reasons, we affirm the judgment of sentence.

---

[1] 18 Pa.C.S. § 2501.

[2] Related charges were Persons not to possess, use, manufacture, control, sell or transfer firearms, 18 Pa.C.S. § 6105, Firearms not to be carried without a license, 18 Pa. C.S. § 6106; and Possessing instruments of crime, 18 Pa.C.S. § 907.

The record reveals that on the night of November 11, 2010, Officer David Grove, a Deputy Wildlife Conservation Officer of the Pennsylvania Game Commission, was patrolling the area near Gettysburg National Military Park in Freedom Township, Adams County when he informed Adams County 911 center at 10:32 p.m. that he had encountered a vehicle "spotlighting"[3] just across from the Battlefield. N.T. 9/24/12 at 56. According to the 911 operator who testified at trial, Officer Grove reported seconds before 10:34 p.m. that he was prepared to stop the vehicle. At just after 10:35 p.m., he transmitted the license plate number of the stopped pick-up truck, which was registered to Appellant. At just before 10:37 p.m., Officer Grove stated that the driver and passenger were out of the pickup truck and he was awaiting assistance before proceeding further.

The next transmission the 911 center would receive came from responding Officer Daniel Barbagello, who, at seconds before 10:39 p.m., called "officer down, officer down." N.T. at 59. Officer Barbagello detected no pulse when he examined Officer Grove, who had been shot three times, including a fatal shot to the back of the neck.

For the six hours leading up to that tragic shooting, 27 year-old Appellant and his 19 year-old friend Ryan Laumann had been drinking beer and driving Appellant's pick-up truck in the area looking for deer to shoot. N.T. 479-515. Earlier that afternoon, Laumann had returned home from work at about 4:00 p.m. to find Appellant waiting there with the odor of an alcohol called "99 Bananas" on his breath. N.T. at 476. Laumann perceived Appellant to be "walking fine, talking fine," though he "seemed to be maybe a

---

[3] "Spotlighting" is a term denoting the sighting of deer or other wildlife at night with the aid of a high powered spotlight.

little tipsy like buzzed a little bit.   He was kind of giggly, more or less just kind of giggled at the smallest little things a little bit." N.T. at 477, 478.   Laumann, a licensed hunter, brought his compound bow with him and rode passenger as Appellant drove capably, in Laumann's opinion, for the approximately five minute drive to the Johnson's hunting cabin off Orrtanna Road. N.T. at 479-480.

After drinking a beer or two, the two men shot Laumann's compound bow, and Appellant's crossbow and .22 long rifle with a scope to make sure they were still "sighted in." N.T. at 480.   They walked along the tree line and climbed up into their tree stand, a three to four foot wide landing accessible by an 18-step, leaning metal ladder,   N.T. at 488.   Lauman carried his compound bow up the ladder while Appellant made his way up the ladder carrying his crossbow without any problem. N.T. at 489.   The two sat on the tree stand until dark without any safety restraints, drank beer, and watched for deer. N.T. at 480.   Over the course of their time there, Lauman saw Appellant drink six or seven cans from a 12-pack of Bud Light while he had two or three. N.T. at 484, 490.   Another source of beer available that night was a small stock of cans kept in the creek, though Laumann did not state definitively whether Appellant drank any from that stock. N.T. at 492-93.   Laumann was "pretty sure," but not certain, that all empties were thrown into the bed of the pick-up truck. N.T. at 493.   At dark, the men climbed down from the tree stand and walked back to the cabin, and again, Laumann saw nothing about Appellant to indicate he was having difficulty with his balance. N.T. at 491.   Other than the moment Appellant quickly went back into the cabin before boarding the pick-up and leaving, the two men were together the entire time. N.T. at 484.

Appellant drove the two to Ross Orchard, where they began spotlighting for deer. N.T. at 494-95. Appellant had no problem negotiating the orchard's roads, which Laumann described as "just little dirt lanes wide enough for a vehicle" and "a little bumpy from time to time[,]" with one hand on the wheel while simultaneously holding a spotlight out the driver's side window with the other, Laumann testified. N.T. at 498. The two spotted a number of deer without any attempt to hunt, and then left the orchard. They drove along local roads, turning frequently, went across a bridge, down a stone lane, and across a creek until they arrived at Red Rock Road. N.T. at 500. Laumann witnessed Appellant drink "a few" more beers from the Bud Light 12-pack during this time, but noted that Appellant negotiated a stretch of road where the two had gotten stuck only ten days earlier. N.T. at 503.

Appellant stopped the pick-up when his spotlight shone upon a doe. He leaned out the window and over the roof and continued to aim the light directly on a doe positioned 20 to 25 yards away in a field along the passenger side as Laumann registered a strike just behind the deer's left shoulder with his compound bow. N.T. at 503, 505. The two did not retrieve the deer, opting instead to give it time to die. N.T. at 507. Appellant drove further along Red Rock Road about a few hundred yards when he spotted a deer in a field on the driver's side. N.T. at 507. Saying he wanted the deer, he backed up into a driveway to change directions on Red Rock Road. He regained sight of the deer and shone a light on it while Laumann pointed the .22 long rifle outside the passenger side window and fired, but he missed. Appellant grabbed the rifle from his position in the driver's seat and leaned across the console to poke his body out the passenger window while still holding the spotlight with his left hand. He then braced the

rifle between his right arm and torso and fired twice at the deer, causing it to stumble and fall. N.T. at 507-512.   On cross examination, Laumann confirmed that Appellant, whom he described as an "average shot," would have used his right hand to pull the trigger, swing the oval lever beneath the trigger down to discharge the shell and back up to load the next shell into place, and then pull the trigger to take the second shot. N.T. at 566-67.

Appellant drove off, leaving the deer for later retrieval, and turned down nearby Schriver Road when he and Laumann noticed headlights appear from behind. N.T. at 516.   Laumann said he believed it was "DNR"[4] and Appellant replied "Do you think?" as they saw blue and red overhead lights activated. N.T. at 516.   Appellant continued to drive around a bend and pulled over alongside the road near pine trees and roadside brush. N.T. at 517.   On cross-examination, Laumann insisted Appellant pulled over immediately, at the first safe opportunity, upon seeing the overhead lights. N.T. at 576.

Before their encounter with Officer Grove would begin, Laumann worried aloud that they were in "a lot of trouble" for shooting the deer, to which Appellant replied "[d]on't worry, I got you, but I'm not going back to jail." N.T. at 518.   Appellant said this in a "normal tone like he was being serious, but [Laumann] did not take it as threatening...like he was going to harm anybody."N.T. at 518.

They remained seated as Officer Grove addressed them by loudspeaker from his patrol SUV. N.T. at 517.   He ordered Appellant to turn off the engine and drop the keys out of the driver's side window, and Appellant complied. N.T. at 517-18.   Officer Grove then directed Appellant to lean his arm outside the driver's side window, open the driver's

---

[4] Presumably, Laumann used the DNR acronym for "Department of Natural Resources," though when asked to specify he said "Game Officer." N.T. at 517.

side door using the exterior handle, step outside the vehicle, close the door, and stand with his hands atop the vehicle. Again, Appellant complied. N.T. at 518.

When Officer Grove asked if there were any passengers in the vehicle, Appellant nodded, and Officer Grove gave Laumann the same instructions for exiting and placing his hands on the vehicle alongside Appellant. N.T. at 519-520. After ordering the men to remain still at that time, Officer Grove remained in his vehicle for about one minute. He asked if there were weapons in the car and, if so, where, and Appellant answered there were weapons in the back seat of the cab. N.T. at 522.

It was at this time Appellant whispered to Laumann that he had a .45 on his side. N.T. at 521. Laumann warned there was nothing he could do about it and that it would be discovered and taken away. N.T. at 521. Officer Grove then ordered Appellant to place his hands on his head and walk backwards towards the patrol car. Appellant was able to comply. N.T. at 522, 579. Officer Grove approached Appellant and placed a handcuff on him, prompting Appellant to yell "What did I do? Why am I being arrested? N.T. at 523-24. Officer Grove gave no answer and Appellant began to resist. Officer Grove's voice rose, Laumann testified, as he issued four or five commands during the struggle for Appellant to get down on the ground. The next thing Laumann heard was the sound of gunshots, and Laumann dropped to the ground behind the truck and lost sight of the encounter. N.T. at 525-26. When he peeked for a second, Laumann saw Appellant standing in a backward leaning posture and firing at least three more shots in rapid succession with the gun in his right hand and right arm fully extended. N.T. at 527, 530, 531, 581. Laumann screamed Appellant's name and then everything went silent.

When Laumann looked up, he saw Appellant rise from a lying position, run for his truck, and stumble and fall while yelling "I'm hit, I'm hit." N.T. at 533. Appellant reached around on the ground near the driver's side of his vehicle and found his keys where he

discarded them minutes before as instructed. N.T. at 535. Laumann stood up and was ordered by Appellant to get in the pick-up. N.T. at 535. Laumann then looked over at the patrol vehicle and could see Officer Grove lying with his head facing the rear tires and his legs pointed to the middle of the road. Laumann boarded the pick-up and Appellant started the engine, put it in drive, and sped off. N.T. at 535.

Leaving the scene at between 60 to 80 miles per hour, Appellant made numerous turns and navigated the "real narrow...bumpy and real windy" pathways he had earlier used to get to Red Rock Road. N.T. at 536, 539. As Appellant drove in this manner, Laumann observed him open the center console and reach around to grab what Laumann believed to be a clip for his .45, which already lay on his lap as he drove. N.T. at 538. Laumann believed it to be a clip because Appellant thereafter leaned forward over his lap and Laumann heard the "click like a snap noise" as when a clip gets pushed into a handgun. N.T. at 539. Laumann kept telling Appellant that he wanted to get out of the pick-up, and about four to five minutes into his flight, Appellant stopped at a rural stop sign and allowed Laumann to grab his belongings and get out of the vehicle. N.T. at 537.

Hours later, Laumann denied knowledge of the incident when investigators visited his house, saying that Appellant had dropped him off at his girlfriend's house at 6:30 p.m. N.T. at 590. He recanted his false statement the following morning, however, and provided investigators with a full eyewitness report of the crime, although he withheld an admission to his having killed a deer with his bow and fired at another deer with a .22 rifle until just two weeks before trial. N.T. at 548-550, 552, 591, 602.

When asked at Appellant's capital trial whether he believed Appellant was drunk at any time during the events of November 11, 2010, Laumann answered "no." N.T. at 553. Appellant seemed "normal" and caused Laumann no concerns while he drove throughout the evening, he said. "There were times he kind of giggled a little bit. That's when I took

it that maybe he was tipsy. Like I wouldn't consider him drunk, but he was feeling the alcohol." N.T. at 554.

Later in his testimony, he elaborated that, to him, tipsy and buzzed meant halfway between sober and drunk. N.T. at 571. He also stated he was not strictly counting the number of beers Appellant drank and that six or seven was a "rough estimate." N.T. at 573. Laumann reiterated that while he saw Appellant pull the clear bag of full beer cans out of the creek to check on them, he never saw Appellant pull a beer out of the bag. N.T. at 573-74.

The following morning, at approximately 9:30 a.m., Edmund Miller was driving along Bingham Road in Franklin Township in his work capacity on what he described as a cool but sunny and pleasant day when he spotted Appellant limping along the side of the road. N.T. 9/25/12 at 280-81. Not knowing Appellant, Miller nevertheless stopped and asked if he needed a ride, but Appellant acted "aloof" and did not seem to want one. N.T. at 281. Miller said "you look like you're hurt," and Appellant then accepted his invitation for a ride. N.T. at 281-82. Appellant gave his destination and directed Miller as they drove. When Miller asked why Appellant was limping, Appellant explained he had slipped on a rock up in the hills. N.T. at 283. Miller drove the approximately two miles toward Appellant's Orrtanna Road hunting cabin, and as he turned onto Orrtanna Road, he could see police cars ahead. About ten police officers converged on his truck when he stopped in the dirt lane leading to the cabin, Miller said, and Appellant did "nothing." "He just wanted [me to turn] in the lane" and drop him off, and said he would walk the rest of the way, Miller testified. Appellant then got out of the truck of his own accord. N.T. at 284, 286, 288, 289.

Officers immediately secured Appellant on the ground with his hands cuffed behind his back N.T. at 298-300. Armed officers backed away from Appellant as

Pennsylvania State Trooper Neal Navitsky of the Fugitive Apprehension Unit approached to read Miranda warnings to Appellant. N.T. at 300, 315. After rolling Appellant on his side to confirm his identity and rule out a possible gunshot wound to the abdomen,[5] Trooper Navitsky crouched down to eye level with Appellant and explained to him the extreme importance of what was about to be read to him, that if he had questions he needed to interrupt and ask, and that he must maintain eye contact so the trooper would know he was being attentive. N.T. at 316, 325. Appellant acknowledged that he understood Trooper Navitsky's instructions and maintained eye contact throughout Miranda warnings. N.T. at 317. When Trooper Navitsky asked him if he understood the rights that were just explained, Appellant acknowledged that he did. N.T. at 317. Asked "[w]ith these rights in mind do you wish to talk with us?" Appellant again answered in the affirmative. N.T. at 318.

When asked what brought everyone here to this point, Appellant replied that he had made some bad decisions. Adams County Detective Frank Donnelly then asked Appellant if he realized he shot a police officer last night. According to Trooper Navitsky, Appellant replied he "didn't shoot a police officer. He was just a game warden." N.T. at 318. Appellant then attempted to clarify his remark by saying he was simply noting the distinction between a police officer and a game warden. N.T. at 319.

Trooper Navitsky redirected the conversation back to the previous night, and Appellant described the entire sequence of events leading up to the shooting, specifically: he and Laumann had poached a deer at night; they drove off but saw red and blue lights appear from behind and pulled over for a vehicle stop; they were ordered to exit their

---

[5] Initial information given to Trooper Navitsky was that Appellant sustained a possible gunshot wound to the abdomen. N.T. at 324. His examination of Appellant revealed no abdominal injury, however, but disclosed, instead, a small amount of blood just below Appellant's belt on his right hip, "as if a pen were to burst in your pocket and leak ink, it was probably that amount of blood that was just below his belt line." N.T. at 324.

vehicle and place their hands on his truck; he "got to thinking" of the .45 caliber handgun on his waistband because he was prohibited as an ex-felon from possessing it, and contemplated removing it and kicking it under his truck to hide it from Officer Grove's detection; he complied with orders to walk backwards towards Officer Grove; he "panicked" when Officer Grove placed a handcuff on his right hand, pulled it away and drew his .45 with the left hand. N.T. at 319-322. When asked how he managed to grab the gun, he explained that, while using his body to block Officer Grove's sightline to the gun, he used his left hand to manipulate the release on the holster, draw the gun, and transfer it to his right hand to begin firing. N.T. at 322. He and Officer Grove exchanged gunfire, Appellant reported, and afterward he retreated to his vehicle and drove away without checking on Officer Grove's condition. N.T. at 322-323.

Appellant said he drove up to a road off of Teaberry and Mountain Cold Springs Road, parked his truck, and began traveling by foot. N.T. at 324. He ascended a steep slope in the woods until he reached a high peak, and threw his .45 handgun down one side of the peak and threw his holster down the other side. N.T. at 324. He attempted to treat the gunshot wound to his hip by cinching his leather belt to act as a tourniquet, he said, to provide compression to the wound. N.T. at 324.

During this initial ten minute interview, Trooper Navitsky found Appellant's answers "very much" responsive to the questions being put to him. N.T. at 327-28. Appellant did not simply answer "yes" or "no," but, instead provided detailed answers demonstrating an understanding of the questions asked, the trooper stated. N.T. at 328. Notably, Trooper Navitsky testified, Appellant gave no indication of experiencing pain or discomfort during the interview. N.T. at 328. He maintained eye contact throughout and, it appeared to Trooper Navitsky in his experience, spoke in an unguarded manner consistent with the giving of truthful answers. N.T. at 328.

Trooper Navitsky paused the interview when EMS arrived to treat and transport Appellant to a hospital. N.T. at 326-327. He gained access to a voice recorder in the meantime, and he and another fully uniformed trooper waited about ten minutes while EMTs prepared Appellant. They eventually boarded the ambulance with three EMTs and Appellant to resume the interview. N.T. at 329. Once inside, Trooper Navitsky began recording and held the recorder in front of Appellant where he could see it. N.T. at 330-331.

Portions of the recording were played at trial. N.T. at 337. At the outset, Appellant can be heard saying "ouch, ouch, ouch[,]" which Trooper Navitsky attributed to Appellant's being placed on his back on the litter causing him to lie directly on his cuffed wrists. N.T. at 338. The troopers removed the cuffs, repositioned Appellant's arms to the front of his body, and cuffed each hand to the nearest siderail of the stretcher for comfort, giving Appellant about six or eight inches of mobility with each arm. N.T. at 338.

At that point, Trooper Navitsky noticed the EMT preparing to administer morphine to Appellant. He can be heard on the tape asking if he could have five minutes to record Appellant's statement before the morphine was administered, and the EMT answered "that's fine." N.T. at 339.

Trooper Navitsky witnessed no change in Appellant's mental status during the course of his interrogation. N.T. at 340. "He was very coherent. He was calm. He was attentive. He was being respectful and polite and he was answering my questions accordingly and expounding on his answers[,]" Trooper Navitsky testified. N.T. at 340. The recorded statement began with the question: "Before we spoke, did I read you something?" and the answer was "Yeah, Miranda rights." Appellant confirmed he knew what Miranda rights were and denied having any illegal drugs in his system. N.T. at 341.

When asked how many beers he had drunk, Appellant answered "two to three." N.T. at 342.

Appellant acknowledged having possessed the .45 handgun for three years, starting shortly after his release from prison. He answered questions about the silhouette targets observed at his cabin and took credit for the closest grouping of three bullet holes, attributing his accuracy from 35 yards out to having taken a "normal" stance instead of turning the gun sideways, which he had apparently done on his other practice shots. N.T. at 344-45. Appellant also took credit for shooting the deer on Red Rock Road, saying he was pretty sure his shot hit its mark, and thought the deer was a mechanical decoy at first like the kind he said he had seen on Iron Springs Road because it had not moved after the first shot. N.T. at 345. When asked about the holstered .45 on his left hip, Appellant explained that the holster was a Blackhawk brand, angled on the left hip to allow the gun to go straight into the right hand reaching across and designed to require the push of a release button before one draws so the gun won't fall. N.T. at 346.

The next portion of the recorded interview involved Trooper Navitsky noting Appellant's request to turn the tape recorder off so he could address a topic off the record. Trooper Navitsky later explained at trial that Appellant wished to advise the trooper of Ryan Laumann's participation in the poaching of a deer the night before. N.T. at 348.

Trooper Navitsky confirmed on cross-examination that Appellant's initial statement and his recorded statement were essentially identical. Nowhere in either statement, the trooper testified, did Appellant explicitly admit that he attempted to shoot directly at or kill Officer Grove. N.T. at 358.

Doctor Kern Michael Hughes, York Hospital staff trauma surgeon testified that at about 11:00 a.m. on the morning of November 12, 2010, Appellant was brought to his trauma unit for the possibility of a serious gun-related injury. N.T. at 369. His vital signs

were normal and, after taking a personal history, conducting a physical exam and reviewing both a chest x-ray, and CT scan of Appellant's abdomen and pelvis, Doctor Hughes determined the bullet wound in Appellant's hip was confined to the superficial regions of the hip. N.T. at 371. This "flesh wound" as Dr. Hughes called it in layman's terms required no surgical intervention, and was treated with antibiotics and a dressing. N.T. at 373. Dr. Hughes' notes, furthermore, described Appellant as alert and oriented during his examination. N.T. at 372.

As he does with all trauma patients due to concern of blood loss, Dr. Hughes continued, he sought to rule out hypothermia during his physical examination and laboratory testing of Appellant. Appellant did not present with hypothermia, even with his exposure to the cool night, and so he excluded it as a concern. N.T. at 374. On cross-examination, Dr. Hughes acknowledged that the hour-long ride in a heated ambulance while receiving a 100 milliliter warm bolus IV would have affected Appellant's hydration and body temperature to some degree, bearing on the issue of hypothermia and dehydration. N.T. at 382-83. Appellant did complain of pain to Dr. Hughes. N.T. at 374. Pain is a very subjective thing, Dr. Hughes explained, and so Appellant was medicated in accordance to his complaint.

The Commonwealth charged Appellant with one count of first degree murder and related offenses and gave him notice of the aggravating circumstances it intended to pursue in the event he was convicted on the main charge. The trial court thereafter denied Appellant's omnibus pretrial motion to quash all but one aggravating circumstances and to suppress his statements to police, the latter motion being denied following a hearing. The court did grant Appellant's motion for a change of venire, and a jury was selected in Lancaster County.

Trial commenced in the Court of Common Pleas of Adams County on September 24, 2012, with the Honorable Michael A. George presiding. On October 3, 2012, the jury returned a guilty verdict on the charge of murder in the first degree and related charges. The case proceeded to penalty phase where the Commonwealth sought the death penalty on four aggravating factors: that the victim was a law enforcement official, 42 Pa.C.S. § 9711(d)(1); that the victim was a prosecution witness killed for the purpose of presenting his testimony, § 9711(d)(5); that the killing happened while in the perpetration of a felony, § 9711(d)(6); and that the defendant had a significant history of felony convictions involving the use or threat of violence to the person, § 9711(d)(9). Appellant's proffer focused on his loving relationship with friends and family, in particular his nine year old daughter, Jasmine, and the substantial impairment he experienced from alcohol consumption. At the conclusion of the penalty phase, the jury found two aggravating circumstances--that the victim was a law enforcement officer and that the killing occurred while in the perpetration of a felony--whereas only one mitigating circumstance was found, the catch-all at 42 Pa.C.S. § 9711(e)(8). Concluding unanimously that the aggravating circumstances outweighed the mitigating circumstances, the jury sentenced Appellant to death for the murder of Officer Grove.

The trial court subsequently denied Appellant's motion for reconsideration on October 15, 2012. This direct appeal followed, in which Appellant raises three guilt-phase issues and six penalty phase issues for our review.

**I.     Sufficiency of the Evidence of First Degree Murder Conviction.**

Before addressing Appellant's enumerated issues, we consider, as we must in all capital cases, whether the evidence is sufficient to support the convictions of first degree murder. Commonwealth v. Zettlemoyer, 454 A.2d 937, 942 n.3 (Pa. 1982). Because

evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. Commonwealth v. Sanchez, 36 A.3d. 24, 37 (Pa. 2011).

"In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the fact finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt." Commonwealth v. Fears, 836 A.2d 52, 58–59 (Pa. 2003). The Commonwealth may sustain this burden by means of wholly circumstantial evidence. Commonwealth v. Montalvo, 956 A.2d 926, 932 (Pa. 2008).

To obtain a conviction of first degree murder, the Commonwealth must

> prove that a human being was unlawfully killed, that the defendant perpetrated the killing, and that the defendant acted with malice and a specific intent to kill. Commonwealth v. Kennedy, [ ] 959 A.2d 916, 920 ([Pa.] 2008). Section 2502 of the Crimes Code defines murder of the first degree as an "intentional killing," 18 Pa.C.S. § 2502(a), which, in turn, is defined as a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." Id. at § 2502(d). It is well-settled that specific intent to kill can be established through circumstantial evidence such as the use of a deadly weapon on a vital part of the victim's body. Commonwealth v. Rega, [ ] 933 A.2d 997, 1009 ([Pa.] 2007).

Commonwealth v. Diamond, 83 A.3d 119, 126 (Pa. 2013).

The evidence as set forth above and admitted in Appellant's jury trial sufficed to support his conviction of first degree murder. Both Appellant's and Ryan Laumann's statements identified Appellant as the man who shot Officer Grove after making the considered decision that he would not go back to prison. In that respect, Laumann provided eyewitness testimony thoroughly detailing the circumstances in which Appellant shot Officer Grove multiple times, including a fatal shot to the neck.

Appellant also demonstrated no physical or mental impairment from alcohol up to and including the time of the shooting, in Laumann's opinion, as Appellant acted and

communicated in a normal manner. He was able to navigate narrow, windy roads while aiming a spotlight and to shoot accurately at deer while holding a light from inside his truck. He pulled over at the first available safe spot when Officer Grove had activated his overhead lights. He stated clearly that he understood Laumann's concern about their impending arrest for poaching, but calmly said he was not going back to prison. He was able to understand and execute Officer Grove's physically demanding orders to exit the vehicle in a counterintuitive way and walk backwards toward the officer with his hands atop his head. He exhibited coordination and dexterity in freeing his cuffed right hand from the officer while simultaneously pressing the release button to his holster with his left hand, drawing his gun, and switching it to his right hand to commence firing at Officer Grove. He avoided crashing the pick-up during his high-speed flight from the scene, and he honored Laumann's request to be let out of the pick-up truck by coming to a stop at a rural stop sign and allowing Laumann to gather his belongings and exit the pick-up.

Appellant gave a statement the following morning that not only contained incriminating content but also displayed keen recollection of sequence and detail about the prior evening, permitting the reasonable inference that drink did not affect his faculties in any way pertinent to the element of forming specific intent. His admittedly bad decisions led to Officer Grove's death, Appellant confessed to Trooper Navitsky, and he provided an account reflecting a mindset during the encounter that was able to both appreciate the implications of his poaching and gun possession and deliberate over his options and understand their respective consequences. One example of the latter is when he considered trying to hide his .45 from Officer Grove by tossing it under the pickup truck as he stood alongside it, he said in his statement presumably to show he had thought of non-confrontational possibilities. He clearly rejected this option as futile, however, choosing instead to engage Officer Grove in violence to avoid arrest.

On the issue of Appellant's alcohol use on the night in question and to what extent, if any, it affected his state of mind at the time of the shooting, the Commonwealth's toxicology expert, J. Ward Donovan, M.D., opined to a reasonable degree of medical certainty that Appellant "was fully capable of forming intent and had capability of rational judgment." N.T. 9/28/12 at 1067. Specifically, even when factoring Appellant's "buzzed" state at the time he first met with Laumann and adopting for the sake of argument the defense position that Appellant consumed about twelve beers over the next six and one-half hours to bring him within an expected BAC range of .15 to .22 percent, Dr. Ward interpreted Appellant's physical deeds and statements at the critical time period, along with his clear memory of the entire evening as demonstrating higher cognitive functioning consistent with an intact mental state capable of forming specific intent. N.T. 9/28/12 at 1069-1086. Finally, the autopsy report and ballistics evidence provided further evidence establishing that among the seven shots Appellant fired at Officer Grove from close range, three struck the officer, including a fatal one to a vital part of the body--the officer's neck. Accordingly, we conclude there was sufficient evidence establishing that Appellant shot Officer Grove to death with malice and the specific intent to kill.

## II. Penalty-Phase Admission of Rebuttal Evidence

Appellant argues that the lower court erred in admitting a seven year-old conviction for Endangering the Welfare of a Child--his then fourteen month-old daughter, Jasmine--as rebuttal to his Section 9711(e)(8) "catch all" mitigation proffer that he currently shares a close and loving relationship with now eight year-old Jasmine, especially where such evidence was admitted without further limiting instruction. The rebuttal evidence not only inflamed the passions of the jury by informing it that he had driven over 100 miles per hour with his toddler daughter in the car, Appellant contends, but also failed the test of relevancy, as it involved an act far too remote in time from the

specific defense proffer that Appellant *currently* offers significant emotional support to his daughter and would continue to do so while incarcerated. N.T. at 1845. As such, the court's denial of Appellant's motion *in limine* seeking exclusion of the prior offense constituted reversible error under Rules of Evidence 404 and 403, as well as under the Eighth and Fourteenth Amendments, Appellant asserts.

The Commonwealth responds that the trial court properly admitted the rebuttal evidence because Appellant's Section 9711(e)(8) presentation went far beyond the current parent-child relationship when it included testimony describing, and a slide show depicting, their relationship from years ago, close in time to the 2005 offense. As such, the mitigation proffer was subject to challenge with respect to its suggestion that Appellant was a responsible, loving father throughout the course of his parenthood, argues the Commonwealth.

The standard of review for the denial of a motion *in limine* is an abuse of discretion. Commonwealth v. Rosen, 42 A.3d 988, 993 (Pa. 2012). "An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." Commonwealth v. Smith, 673 A.2d 893, 895 (Pa. 1996).

During the penalty phase, Appellant called several witnesses to provide mitigating evidence as to his character. Former next-door neighbor Barbara Garde watched Appellant grow from a child to an adult and a father. She described him as a "very, very good loving, loving, responsible father in my opinion." N.T. 1546. On cross-examination, she was asked whether she knew of his 2005 conviction for an incident in which he was engaged in a high speed chase with the police while his daughter was in the back seat, to which Garde responded "no, I wasn't aware of that. It doesn't change my opinion,

though." N.T. 1548. To the question of whether she would still consider Appellant a very good, loving, responsible father, Garde replied "Well, maybe except for that one incident. There's a lot more to being a father than just one single incident. N.T. at 1548.

Appellant's younger sister, Brandy Johnson, described the loving relationship between Appellant and Jasmine, saying "[s]he's always been daddy's girl since the day she was born. Christopher would do anything for her." N.T. at 1555. During her testimony, a video was played depicting Jasmine's third birthday party while Brandy Johnson narrated scenes explaining how Appellant got the cake, prepared the whole day beforehand, and doted on Jasmine at the party in a variety of ways. N.T. at 1558-59. Brandy also described how Appellant helped raise her son and "taught him how to be a boy" during this same timeframe. "He would do anything for them two little babies[,]" Brandy testified. N.T. at 1560-61. She also testified as to how Appellant took better care of her than their father did when they were children growing up together. N.T. 1572.

Appellant's mother, Kimberly Topper, gave extensive testimony about Appellant's history as a father starting from the day Jasmine was born: "I could see the lights in his eyes was [sic] like the lights. I could see the beauty that he saw in her like the day he was born that I saw in him." N.T. at 1480-81. Topper described how Appellant assumed primary responsibility for Jasmine's emotional and financial support when Jasmine was around one year old because of the mother's drug using lifestyle:

> **[TOPPER]**: "He would say, mom, I can't keep my eyes open anymore. He says, *I'm afraid Jasmine is going to get hurt.* Can you come here and just let me get an hours's [sic] sleep, two hours, something like that and I'd go get her and bring her back to work with me. . . . Sometimes I'd have to wait until I got off work at three or four so he could get a couple hours sleep before he had to go back to work and sometimes she'd show up just before he had to go to work. She would be out, you know, she was running around with friends and --"

N.T. at 1482 (emphasis added). Topper also narrated a slide show which included photos depicting, among other things, Appellant and Jasmine together in her first years. N.T. at 1499-1500.

The trial court's ruling was correct, as the record confirms Appellant's proffer was not confined to his current relationship with his daughter but extended well back to a time proximate to his 2005 offense. Testimony referred to his parenting through the years, while other witnesses described his daughter as having been "daddy's girl since the day she was born." N.T. 1555. Additional character evidence portraying Appellant as a man known to be loving and religious, kind and helpful to neighbors, and whose behavior up to the time of the murder had been non-assaultive, also made relevant rebuttal evidence revealing a moment in this time period where Appellant posed a serious threat to his child with conduct marked by a disregard for her safety and welfare.

Contrary to Appellant's contention, therefore, admission of Appellant's 2005 Endangering the Welfare of a Child conviction was relevant response to his subsection (e)(8) proffer, as it bore upon mitigation evidence offered to show Appellant as a loving and caring father throughout Jasmine's life.[6] To Appellant's Pa.R.E. 403 argument that the danger of unfair prejudice arising from evidence of his prior conviction outweighed its probative value with respect to the issue of Appellant's history as a loving, caring, and selfless parent, well-taken is the trial court's response that any prejudice in the admission was not an unfair result of a jury's potential emotional response but was, instead, a fair result from the nature of Appellant's act itself. N.T. at 1368.[7] We thus find no merit to this claim.

---

[6] As such, we deem meritless Appellant's argument that admission of his prior conviction amounted to the introduction of a non-statutory, additional aggravating circumstance that unduly "obliterated" his mitigation proffer. Properly admitted rebuttal evidence does not fall under such category. See Commonwealth v. Lesko, 15 A.3d 345, 390 (Pa. 2011).

(continued…)

### III. Penalty Phase Instruction on the Applicable Standard of Review for Voluntary Intoxication as a Mitigating Factor

Appellant next asserts the sentencing court erroneously charged the jury that the same standard applicable in the guilt phase determination of whether intoxication diminished Appellant's capacity to form the specific intent to kill also applied in the penalty phase determination of whether his voluntary intoxication served as a mitigating circumstance under either 42 Pa.C.S. § 9711(e)(3)[8] and the "catch-all" mitigator of 42 Pa.C.S. § 9711(e)(8)[9]. In so equating the penalty standard with a guilt standard the jury had already applied to reject his voluntary intoxication defense, Appellant contends, the lower court "categorically barred the penalty-phase jury from considering" his heavy consumption of alcohol on the day of the murder as a mitigating factor and thus denied him his rights under the Pennsylvania death penalty statute and the Eighth and

(…continued)

[7] Appellant raises an adjunct argument that a limiting instruction was required to cure the inflammatory effect that admission of his prior conviction allegedly had on the jury. Appellant waived this claim through his silence during both the admission of the evidence and at the conclusion of jury instructions, particularly in light of the court's pre-hearing assurance that it would give a limiting instruction "at Appellant's request" should the Commonwealth offer into evidence his prior conviction. See Commonwealth v. Johnson, 668 A.2d 97, 104 (Pa. 1995) (deeming waived appellant's claim of erroneous omission of a curative instruction when appellant failed to pursue the instruction). Moreover, Pa.R.A.P. 1925 waiver applies, as Appellant failed to include this claim in his concise statement of matters complained of on appeal. See Commonwealth v. Lord, 553 Pa. 415, 719 A.2d 306 (1998) (holding issues not raised in Rule 1925 concise statement are waived).

[8] § 9711(e)(3) provides for a mitigating circumstance when "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired."

[9] § 9711(e)(8) provides for a mitigating circumstance upon the existence "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

Fourteenth Amendments. See Tennard v. Dretke, 542 U.S. 274 (2004) (recognizing a defendant's right to jury deliberation on mitigating evidence that a juror could reasonably find warrants a sentence less than death).

Appellant acknowledges that success on this claim with respect to the (e)(3) mitigator depends on our taking up his call to overrule a line of precedent holding that the guilt and penalty phase standards in this context are functionally equivalent. He attempts to distinguish the cases factually from his own, however, and further assails the precedent as having inexplicably and erroneously grafted a guilt phase standard for determining specific intent on penalty phase considerations of impaired capacity that are specifically delineated by statutory language setting forth a different standard.

Indeed, our jurisprudence has confirmed that it is "binding precedent" that a defendant convicted of first degree murder in rejection of a voluntary intoxication defense would seem "logically precluded" from proving § 9711(e)(3) substantial impairment by a preponderance of the evidence in the penalty phase. Commonwealth v. Gibson, 19 A.3d 512, 529 n. 18 (Pa. 2011).[10] See Commonwealth v. Spotz, 47 A.3d 63, 117 (Pa. 2012)

---

[10] In Gibson, this Court recognized that substantial impairment of either capacity as stated disjunctively in subsection (e)(3), i.e., capacity to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of the law, could stand alone as a means by which to secure the mitigator: "There is no dispute that Appellee appreciated the criminality of his conduct, for reasons already explained. The only question is the degree to which the PCRA evidence would have demonstrated to the jury that Appellee was substantially impaired in his capacity to conform to the law." Id. at 528-29. Though recognizing a conceptual difference between the two subsection (e)(3) expressions, we still acknowledged application of the same evidentiary standard to both. As such, in specifically assessing the appellee/defendant's capacity to conform to the law, we applied, over the appellee's opposing argument, the guilt-phase voluntary intoxication defense standard in accordance with binding precedent that logical preclusion applied given the facts of the case. Id. at 529 (citing Commonwealth v. Flor, 998 A.2d 606, 627 n. 7 (Pa. 2010) (recognizing that, to demonstrate the (e)(3) mitigator based on voluntary intoxication, the defendant must have been "overwhelmed or (continued…)

(recognizing first degree murder conviction logically precludes application of the (e)(3) mitigator); Marinelli, 810 A.2d at 1277 (applying guilt phase standard for voluntary intoxication in penalty phase). [11]   In so doing, our Court effectively applied interchangeably between guilt phase and penalty phase the standard that a defendant must show he was so overwhelmed by intoxication as to be incapable of forming the specific intent to kill at the time of the murder.

The Commonwealth first responds that Appellant waived this claim by making a vague and undeveloped objection to the jury charge.   By both objecting ambiguously at side-bar that the charge implicated "one of our mitigators" and refusing the court's invitation to explicate, answering instead, "that's it, thank you, Judge[,]" Appellant fatally

---

(…continued)

overpowered by alcohol to the point of losing his faculties so as to be incapable of forming a specific intent to kill") (quoting Commonwealth v. Marinelli, 810 A.2d 1257, 1277 (Pa. 2002)).   To the extent that the subsection (e)(3) mitigating factor is thus logically precluded by the jury's verdict that a defendant formed the specific intent to kill, we concluded, "the jury may consider voluntary intoxication of a lesser degree under subsection (e)(8)." Id. at 531, n.18.

It is in light of this precedent that we consider, infra, Appellant's underlying question of whether the second part of the (e)(3) mitigator--regarding a substantially impaired capacity to conform one's conduct to the requirements of the law--imposes a less stringent standard than the guilt phase standard on specific intent articulated above.

[11] Our jurisprudence would seem to allow that exceptions to our observation on logical preclusion may attend instances where the penalty phase defendant introduces a greater quantum or quality of voluntary intoxication evidence than he did in the guilt-innocence phase.   For example, a penalty-phase defendant may elect to abandon a failed guilt-phase "mistaken identity/alibi" defense, to which intoxication evidence would have been irrelevant, and press an (e)(3) mitigation case through evidence of his intoxicated state at the time of the murder.   So, too, may a general guilt-phase strategy of foregoing a voluntary intoxication defense because of its potential to spawn adverse character judgments, see Gibson at 527 (collecting cases recognizing aggravating effect of voluntary intoxication defense), be abandoned in a penalty-phase decision that a new course of action is necessary.   In the case sub judice, Appellant made no enhancement of his guilt-phase intoxication proffer in the penalty-phase.

omitted to specify whether it was the mitigator at subsection (e)(3) or subsection (e)(8) that was, in his opinion, unduly affected by the charge. The Commonwealth also argues that Appellant effectively acceded to the charge when he replied "there may be" to the court's comment that "there's a case right on point" in support of the charge, thereby providing alternate grounds for waiver.

In any event, the Commonwealth contends, Appellant's claim is meritless as to the (e)(3) mitigator given binding precedent of this Court that the standards are the same. As for Appellant's argument assailing the charge with respect to the subsection (e)(8) mitigator, the Commonwealth points to the dearth of voluntary intoxication evidence he offered for this mitigator: "Defendant's drinking on the day and night of the murder was a small and hardly persuasive aspect of the defense mitigation case. Its primary, if not exclusive, relevance was to the 'extreme mental or emotional disturbance' and 'substantial impairment' mitigators." Brief for Appellee at 24.

At the penalty phase hearing, the trial court issued the following pertinent instruction:

> **THE COURT:** Now, ladies and gentlemen, in this case the Defendant has set forth and the Sentencing Code identifies what are known as mitigating factors. As I described earlier for you, mitigating factors must be only proven by a preponderance of the evidence.
>
> The mitigating factors identified by the defense include the following:
>
> The mitigating factor alleged that Christopher Johnson was under the influence of extreme mental or emotional disturbance. A second and separate mitigating factor that the capacity of Christopher Johnson to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, and the third mitigating factor which is identified is--consists of evidence of mitigation concerning the character and record of Christopher Johnson and the circumstances of his offense.

In that regard, ladies and gentlemen, the . . . Defendant has identified factors that they would like you to consider in determining whether that mitigating circumstance exists.

Those factors consist of the following: That Mr. Johnson was under the influence of alcohol when the accident occurred. *In regard to that particular factor, ladies and gentlemen, the same standard of determining its applicability , which I described during the guilt phase of this trial, is applicable. In other words defining whether or not that is a consideration.*

N.T. 10/4/12 at 1844-45 (emphasis added).

During subsequent side-bar discussions about the charge, Appellant raised the following objection to the above instruction on voluntary intoxication:

**DEFENSE COUNSEL:** We were--again, we were just objecting to the instructions on the victim impact evidence that we had talked about before. I don't thik that was on the record. And I had a question for you because you said it quickly and I wasn't sure I understood it. We had alleged as one of our mitigators he was under the influence of alcohol and did you say the same standard applied as the legal intoxication for first to third degree?

**THE COURT**: I did.

**DEFENSE COUNSEL:** Well, we would object to that.

**THE COURT:** I believe there's a case right on point on that.

**DEFENSE COUNSEL:** There may be.

**THE COURT:** Any comment?

**PROSECUTOR:** Nope.

**DEFENSE COUNSEL:** That's it. Thank you, Judge.

**THE COURT:** All right.

N.T. at 1860-61.

This objection left the trial court to speculate as to which mitigating factor defense counsel referred in his objection. Presuming the competency of counsel, as we must under Sixth Amendment decisional law, we may presume counsel knew that for nearly a decade our jurisprudence had held and reaffirmed in the subsection (e)(3) context that

the guilt and penalty phase standards for voluntary intoxication were functionally equivalent, whereas the subsection (e)(8) inquiry allows a lower standard permitting all mitigation evidence to be considered, See Gibson, supra. It could therefore reasonably be inferred that counsel objected to the application of the guilt phase voluntary intoxication standard to the jury's deliberations on the (e)(8) mitigation offer. It is just as reasonable under the same presumption of Sixth Amendment competence, however, that counsel directed his objection to the subsection (e)(3) proffer as a constitutional challenge to the current state of our relevant jurisprudence. As can be seen, one cannot be sure as to which mitigator counsel actually referred.

Indeed, the trial court invited defense counsel to explicate his position, and perhaps if counsel did so the court could have discerned the specific objection laid before it and considered on the record whether a modification to the instruction was necessary. As the record stands, however, Appellant declined the court's invitation to clarify his ambiguous objection, leaving the precise basis for counsel's objection indeterminable. As we may not base our review on presumptions and speculation about what counsel meant when he offered an ambiguous objection to the court, invocation of the waiver doctrine is appropriate. See Commonwealth v. Pressley, 887 A.2d 220, 224 (Pa. 2005). (requiring a specific objection to the charge to preserve an issue involving a jury instruction).

Even if we were to address Appellant's bare assertions that 1) a decade's worth of jurisprudence identifying the appropriate standard for voluntary intoxication in the penalty phase is based upon a flawed interpretation of an inapposite seminal case; 2) the language of the (e)(3) mitigator as a whole presents a less stringent standard than that applicable in a guilt-phase voluntary intoxication defense; 3) at least one of the (e)(3) mitigator component parts, i.e., the incapacity to conform one's conduct to the

requirements of the law contemplates an aspect of the mental state distinct from intent that cannot, as a matter of linguistics, be contemplated by the guilt phase standard; and 4) the above instruction completely precluded the jury from considering the effects of Appellant's alleged heavy drinking in its (e)(8) deliberations, we would find each assertion as briefed presents as a broad pronouncement which, though eloquent to the extent it is made, is nonetheless devoid of specific references of support in the record and lacking in developed analysis. One example is the paucity of argumentation on alcohol's effect on Appellant's capacity to conform his conduct to the requirements of the law, the second expression of the § 9711(e)(3) mitigating circumstance. Indeed, the only reference Appellant makes to his subsection (e)(3) proffer is "Appellant offered evidence of his heavy consumption of alcohol the day of the incident as mitigating factors under . . . 42 Pa.C.S. § 9711(e)(3) (ability to appreciate criminal conduct was substantially impaired)." Brief for Appellant at 20-21. In referring only to the first of two parts of the subsection (e)(3) mitigator, Appellant implies that he made no proffer relevant to a challenge that he possessed a substantially impaired capacity to conform his conduct to the law. Later in his brief, however, Appellant does make the statutory construction statement in the abstract that our jurisprudence equating voluntary intoxication standards applicable in each trial phase works the absurd result of precluding a jury from ever finding mitigation through proof of a substantially impaired capacity to conform one's conduct to the law. Again, however, nowhere does Appellant indicate where in the record he advanced argument on this part of the subsection (e)(3) mitigator to the jury.

Another example is Appellant's claim that the voluntary intoxication standard applying to the subsection (e)(3) mitigation case must be less stringent than the standard applying to a guilt-phase voluntary intoxication defense. Other than stating this proposition as if it were self-proving on its face, Appellant provides no further discussion

as to why it is less difficult to bear the burden of proving by a preponderance of the evidence that heavy drinking substantially impairs a defendant's ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law than it is to present enough evidence that drink overwhelmed a defendant's faculties so as to inject reasonable doubt as to defendant's ability to form specific intent.   Our jurisprudence has interpreted subsection (e)(3) to come under the guilt phase voluntary intoxication standard for nearly a decade, and, under the doctrine of *stare decisis*, it was thus incumbent upon Appellant in seeking the overhaul of such precedent to assume the burden of developing a comprehensive discussion demonstrating that substantive differences between the statutory (e)(3) mitigator and the guilt phase diminished capacity by intoxication inquiry exist warranting different treatment of each.[12]   No such advocacy appears before us.

Elsewhere in his brief, Appellant argues that our equation of the two standards works the indefensible result of rendering the statutory (e)(3) mitigator "absurd" and a nullity, but this assertion fails to consider that our decisions have dealt only with cases in which the defendant's penalty phase proffer and guilt phase proffer were essentially the same.   As addressed in footnote 11, *supra*, it would seem that in cases where a penalty-phase defendant either presents an intoxication case for the first time--having

---

[12] "'Any departure from the doctrine of *stare decisis* demands special justification.' Arizona v. Rumsey, 467 U.S. 203, 212, (1984).   We have said also that the burden borne by the party advocating the abandonment of an established precedent is greater where the Court is asked to overrule a point of statutory construction.   Considerations of *stare decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done." Patterson v. McLean Credit Union, 491 U.S. 164, 172-73 (1989), *superseded by statute as stated in* CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008).

elected to forego an intoxication defense at trial--or enhances his guilt phase intoxication defense appreciably, the jury's first-degree murder verdict would not logically preclude it from finding the subsection (e)(3) mitigator satisfied on the basis of newly presented penalty-phase evidence. Therefore, simply because a jury's rejection of a guilt-phase intoxication defense would logically foreclose (e)(3) mitigation on the same body of evidence does not render the (e)(3) mitigator a nullity. § 9711(e)(3) mitigation is still available, as a matter of logic, to the penalty phase defendant who adds to the quantum or quality of intoxication evidence previously offered at trial.

One final omission from Appellant's argument is a fully developed discussion of whether he even laid an evidentiary foundation entitling him to the subsection (e)(3) mitigator instruction at all. In Gibson, supra, we reviewed a capital Post Conviction Relief Act appeal relating to the appellee's conviction for killing a Philadelphia police officer and a bystander during a failed robbery attempt of a bar. In a unanimous decision reversing the PCRA court's order vacating sentence and remanding for a new penalty hearing on, *inter alia*, PCRA testimony regarding the appellee's (e)(3) proffer, this Court observed that the evidentiary record called into question whether, as a matter of law, the appellee was even entitled to an instruction on the (e)(3) mitigator. Noting initially that there was no question that Appellee appreciated the criminality of his conduct--given the guilt-phase presentation of evidence offered on specific intent to kill--we inquired into the degree to which the evidence would have demonstrated a substantial impairment in his capacity to conform to the law. On this point, however, the evidence was lacking, we reasoned, as defendant's own experts found insufficient evidence that defendant was intoxicated on the critical moment. Gibson at 529.

As to the sufficiency of Appellant's proffer in this respect, we find only one passage in his brief relevant, where he offers in his "Statement of the Case" that "Appellant put on

expert toxicological evidence regarding his impairment, N.T. p. 937[,]" which, it should be noted, directs the reader to an irrelevant portion of testimony some 50 pages removed from the beginning of the toxicologist's testimony. With no account of, or developed discussion about, the toxicologist's findings and the significance thereof in the argument section of his brief, we find a second basis upon which Appellant failed to preserve this issue for our review.

In any event, our own review of testimony offered by Appellant's toxicologist shows it to have been equivocal at best on the effects alcohol had on Appellant's powers of judgment and intent formation as the expert was confronted with examples of Appellant's specific actions and statements with respect to the time leading up to, including, and after he shot Officer Grove. There was some indication that at a .22 BAC, which represented the absolute highest number in the hypothetical BAC range of .15 to .22 percent at the time of the shooting rendered from the evidence, one could suffer impairment of judgment and undergo a disinhibitory effect, but no further elaboration was made on that point. The toxicologist also opined that Appellant's ability to perform the distracted tasks involved in aiming a spotlight to look for deer while driving, accurately shooting a deer with two shots, and driving away to evade detection of his illegal conduct with the intention of returning later to retrieve the deer reflected higher levels of cognitive function, which militated toward inferring lower degrees of impairment to his cognitive abilities. This equivocation manifested itself at the conclusion of the toxicologist's testimony, where the most he could state to a reasonable degree of medical certainty was that, even at the hypothetical's top end .22 BAC, "it could happen" that "an individual could lose his faculties needed to form the specific intent to kill," N.T. at 1009, and that such opinion applies to this case. N.T. at 1047. To the follow-up question immediately posed by the Commonwealth as to whether one can infer from the challenging circumstances

overcome by Appellant in poaching a deer--just minutes before the police encounter--a specific intent to kill the deer, the toxicologist answers "yes." N.T. at 1047-48. Such a qualified and equivocal opinion failed to lay an evidentiary foundation for an (e)(3) mitigation instruction.

## IV.    Comparative Worth Remark in Penalty Phase Opening Statement

Appellant next charges reversible error with the court's refusal to grant mistrial in response to the prosecutor's penalty phase opening remarks inviting the jury to consider whether the mitigation evidence it was about to hear concerning the life of Appellant outweighs the life of the victim. Specifically, the controversial remark went as follows:

> You will be asked at the conclusion of this sentencing hearing to look at the facts presented in mitigation and the facts presented in aggravation. When listening to the testimony concerning the life of the Defendant, the one question I would like you to think about when hearing all the testimony in the sentencing hearing is does any of that evidence outweigh the life of Officer Grove?

N.T. at 1407. Defense counsel objected and moved for a mistrial. Side-bar discussion ensued during which the trial court found it necessary to have the jury removed to the deliberation room. After denying defense counsel's motion, the court called for the jury's return and then issued the following curative instruction:

> **THE COURT:**    Your oath in this matter, ladies and gentlemen, commits you to a fair and impartial consideration of the evidence to determine the facts. Once your oath allows you to determine those facts, you are then required to apply to those facts the law which I give you and then reach an appropriate sentences based upon the facts as you and you alone determine and the law given to you by the court.
>
> Ladies and gentlemen, I will remind you once again that the aggravating circumstances which have been identified are the aggravating circumstances which the Commonwealth is alleging. They must be proven by proof beyond a reasonable doubt. The defense has identified mitigating circumstances. Once again, those are mitigating circumstances which must be proven by preponderance of the evidence.

Your obligation as jurors when this matter proceeds to sentencing, and I will give you more detailed instructions at the conclusion, is to weigh those aggravating circumstances against the mitigating circumstances.

You may only take into account in that balancing process the aggravating circumstances which were proven to you by proof beyond a reasonable doubt and the mitigating evidence, if any, which was proven to you by a preponderance of the evidence. It is not a proper consideration to weigh the value of one life against another life and you may not do so. That would be a violation of your oath.

N.T. 10/2/12 at 1410-11.

Appellant acknowledges the presumption under the law that juries follow court-issued instructions, but argues that "words once spoke can never be recalled[,]" particularly where a jury is asked to engage in the "legally improper but all-too-human tendency to compare one life against another." Brief for Appellant at 29. No one question may encompass the entire death penalty process, Appellant contends, citing extra-jurisdictional caselaw,[13] and an invitation to distill the many considerations a jury must make into the single question of "whose life has more value" runs the risk of injecting bias and caprice into the sentencing decision.

The statement deprived him of a fair trial despite the issuance of a curative instruction, Appellant continues, because the statement represented neither fair comment on the evidence nor appropriate oratorical flair, but was, instead, "a non-impassioned attempt to focus the jury, before mitigation had even begun, on an improper and highly prejudicial consideration: 'Does any evidence outweigh the life of Officer Grove?'" Brief for Appellant at 30. That it was the "captain of the prosecution team" who made the statement only adds to misconduct and creates the reasonable possibility that the verdict was the product of the jury's inflamed passions instead of reason, Appellant concludes.

---

[13] Storey v. State, 901 S.W.2d 886, 902 (1995).

The Commonwealth places its statement within the bounds of permissible oratory directed at convincing the jury to disfavor the defense's mitigation evidence in favor of imposing a sentence of death. To that end, the Commonwealth asserts the remark was primarily intended to place in sharp relief a decision the jury would have to make as to whether the mitigation proffer outweighed the undisputed aggravating circumstance at Section 9711(d)(1) for the killing of an officer during the performance of his duties. Even if these words as uttered were improper, they were too innocuous and briefly stated to prevent the jury from objectively weighing the evidence, the Commonwealth continues. Finally, any possible taint from the statement was cured by the trial court when it sustained the defense objection and delivered a curative instruction.

Our standard of review in assessing the denial of a mistrial is as follows:

> The trial court is in the best position to assess the effect of an allegedly prejudicial statement on the jury, and as such, the grant or denial of a mistrial will not be overturned absent an abuse of discretion. A mistrial may be granted only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. Likewise, a mistrial is not necessary where cautionary instructions are adequate to overcome any possible prejudice.

Commonwealth v. Rega, 593 Pa. 659, 692, 933 A.2d 997, 1016 (2007) (citation omitted).

"It is well-settled that, during the penalty phase, where the presumption of innocence no longer applies, a prosecutor is afforded reasonable latitude and may properly comment on the evidence with oratorical flair." Commonwealth v. Freeman, 827 A.2d 385, 408 (Pa. 2003) (collecting cases). "[C]omments by a prosecutor do not constitute reversible error unless their unavoidable effect was to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true penalty determination."

Commonwealth v. Johnson, 668 A.2d 97, 107 (Pa. 1995), *cert. denied,* 519 U.S. 827, 117 S.Ct. 90, 136 L.Ed.2d 46 (1996).

The excerpt above shows that the prosecutor asked the jury to ask itself whether any of Appellant's mitigation evidence outweighed the life of Officer Grove. The trial court's interpretation of this request was that it asked jurors to assign a weight to the respective lives of Appellant and Officer Grove and then decide whose life was worth more. This, the trial court found, was impermissible and required an immediate curative instruction. The Commonwealth's insistence, on the other hand, is that the prosecutor was attempting to focus jurors on their eventual obligation to weigh the mitigation evidence against the Section 9711(d)(1) aggravating circumstance of having killed an officer during the performance of his duties. The transcript shows that the prosecutor did immediately offer this position in response to the objection, wherein he stated "[h]e is a law enforcement officer is the aggravator, the killing of a law enforcement officer in the line of duty. That's what it means. That's what was said." N.T. at 1408.

The issue as presented, therefore, is whether the prosecutorial comment was both improper and so prejudicial that it rendered trial fundamentally unfair. Initially, while we do not reject out-of-hand the possibility that a juror may have understood the prosecutor's remark as a reference to the (d)(1) aggravator, see *infra*, a plain reading of the statement requires that we subordinate this possibility to the court's interpretation, i.e., that the prosecutor improperly invited the jury to weigh "the life" of Officer Grove against Appellant's mitigation presentation of his life.

Prosecutorial calls to consider victim impact evidence alongside a defendant's mitigation evidence have increasingly come into practice following the United States Supreme Court decision in Payne v. Tennessee, 501 U.S. 808 (1991), which recognized

the constitutionality of victim impact statements.[14]   In Payne, the Court reconsidered prior holdings prohibiting the admission of victim impact evidence in criminal trials. Id. at 817-27.   Overruling both Booth v. Maryland, 482 U.S. 496 (1987) (discerning Eighth Amendment violation in admission of victim impact statements, which prove irrelevant to defendant's culpability and risk arbitrary and capricious imposition of death penalty) and South Carolina v. Gathers, 490 U.S. 805 (1989) (holding evidence of murder victim's personal characteristics irrelevant to circumstances of the crime and thus violative of Eighth Amendment), Payne observed that "a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." Id. at 825.   The Booth paradigm, the Court opined, "unfairly weighted the scales in a capital trial; while virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances, the State is barred from either offering 'a glimpse of the life' which a defendant 'chose to extinguish,'" id. at 822, (quoting Mills v. Maryland, 486 U.S. 367, 397 (1988) (Rehnquist, C.J., dissenting)), or "demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide." Id.   Accordingly, the Court held that "if the State chooses to permit the admission of victim-impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar." Id. at 827.

The only constitution-sourced limit Payne recognized regarding the otherwise constitutionally valid use of victim-impact evidence was in the Fourteenth Amendment's Due Process Clause:   "[i]n the event that evidence is introduced that is so unduly

---

[14] With our decision in Commonwealth v. Means, 773 A.2d 143 (Pa. 2001), this Commonwealth joined the majority of states permitting victim-impact statements allowing evidence of the victim's personal characteristics and the harm sustained by the victim's family and community.

prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." Id. at 825. While Payne provided no explicit delineation between fair and unduly prejudicial commentary in this regard, it did observe that there was "no reason" to treat victim-impact evidence "differently than other relevant evidence[,]" and cited Darden v. Wainwright, 477 U.S. 168 (1986) as authority on the application of due process limits.

Darden addressed whether a prosecutor's extreme and unquestionably improper comments made during the guilt phase of a capital murder trial were so unfair as to render the defendant's conviction a denial of due process. "It is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden at 181 (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)). As such, the court in making its due process inquiry considered the challenged conduct in relation to the proceeding as a whole.

Applying the "narrow [standard of review] of due process," Id., the Court first considered the nature and extent of the improper argument and determined the argument "did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent." Id. at 181-82. Other factors influencing the Court's due process analysis included: much of the argument was responsive to the opening summation by the defense (a point not meant to excuse the impropriety of the argument but to help better ascertain the effect of the comment by placing it in context); the issuance of curative instructions that the jury's decision must be based on evidence alone and that arguments of counsel were not evidence; the weight of the evidence against the defendant was heavy; and defense counsel's "very effective[]" rebuttal argument "turning much of the prosecutors' closing

argument against them by placing [it] in a light that was more likely to engender strong disapproval than result in inflamed passions against petitioner." Id. For these reasons, the Court concluded the defendant's trial "was not perfect--few are--but neither was it fundamentally unfair." Id. at 183 (citation to federal district court decision omitted).

As referenced in Payne, therefore, it is evident that the Darden and DeChristoforo approach applies to a due process challenge to prosecutorial comment relating to victim-impact and characteristics evidence. As a logical extension, the prosecutorial practice of asking a jury to consider the defendant's mitigation evidence in light of impact and personal characteristic evidence of the victim's life is likewise appropriate under the aegis of Payne and its declaration that "there is nothing unfair about allowing the jury to bear in mind that harm [i.e., that harm caused by the loss of the victim's life] *at the same time* as it considers the mitigating evidence introduced by the defendant." Payne at 826 (emphasis added). As for the practical result of engaging in this deliberative exercise, the very act of weighing mitigation evidence in light of victim impact/characteristics evidence is endorsed by the Court's opinion that a jury may fairly consider both "at the same time" when deciding ultimately the weight given to aggravating and mitigating factors, respectively.

In the case *sub judice*, however, the question arises whether the prosecutor's explicit call for the jury to consider whether Appellant's mitigation evidence outweighed "the life" of Officer Grove comes under the above analysis, as the statement as made goes beyond asking the jury merely to consider victim impact/characteristics evidence and mitigation evidence together. The concern emerges that the prosecutor's argument as articulated would instead cause the jury to believe it was tasked with weighing one life against another in an arbitrary procedure--one neither reflecting the facts of the case nor expressed in the law they swore to apply in deliberations--whereby it should impose

death simply if it finds Appellant's life is worth less than Officer Grove's. In this respect, therefore, the prosecutorial comment fell outside the realm of Payne paradigm and was plainly inappropriate.

In our view, however, the totality of circumstances surrounding the comment prevented it from prejudicing the jury. Looking at the extent and nature of the opening comment, we see it was a brief, indeed truncated remark not couched in an otherwise emotionally inflammatory plea recalling graphic details of the crime or describing Appellant in derogatory terms, and the court's sustaining of the defense objection stopped the comment short of including an overt discussion on the relative worth of each life.[15] Also going to the nature of the remark and its potential for prejudice is the reasonable, albeit decidedly lesser possibility under the facts that a juror could have understood it as a request to focus particular attention on how the mitigating proffer weighed against the enumerated aggravating factor at 9711(d)(1) that Appellant took the

_____

[15] Compare Humphries v. Ozmint, 397 F.3d 206 (4th Cir.2005), in which the circuit court reviewed the totality of circumstances and rejected a charge of fundamental unfairness in the prosecutor's closing at the sentencing phase. The statements in question included (1) "…when you look at the character of this Defendant, and when you look at [the victim], how profane when you look at all the circumstances of this crime and of this Defendant, how profane to give this man a gift of life under these circumstances."; (2) "What punishment do you recommend when you've got a character like that? What punishment do you recommend when somebody like [the victim] is taken from us?"; and (3) "if not in a case as aggravating as this, if not in a case with absolutely no mitigation like this, if not in a case with a character like this, if not in a case when somebody like [the victim] is taken, then when are you going to do it?". The court based its decision on several factors, including that the comparison between the defendant's and victim's life was not the centerpiece of the prosecutor's argument, and that the the solicitor did not overtly say that the defendant's life was worth less than the victim's. In that latter regard, it distinguished its facts from those in a recent state case in which the South Carolina Supreme Court found fundamental unfairness in a prosecutor's challenge to the jury that it compare the life of the defendant to the lives of the two juvenile victims and ask itself whether their lives were worth the life of the defendant, "the psychopath, this killer who stabs and stabs and kills, and rapes and kidnaps." Hall v. Catoe, 360 S.C. 353, 601 S.E.2d 335 (2004).

life of a uniformed officer in the line of duty.   Though, as noted above, we subordinate this possibility to the far greater likelihood that the jury would have perceived the remark as a comparative worth argument, and we are cautious not to otherwise overstate this secondary aspect of the remark, we nevertheless find this possibility served as an additional tempering feature under the facts.

Most instrumental, however, in arresting any potential prejudice attendant to the comment was the trial court's swift and unequivocal response in issuing a detailed, and comprehensive curative instruction reminding the jury that it was prohibited from basing its sentence on the comparative worth of the victim's and defendant's respective lives, and that it must, instead, make its sentencing decision on the evidence alone and in accordance with instructions on applicable law.[16]   Finally, a two and one-half day penalty trial replete with evidence wholly unrelated to the controversial remark followed, and the jury returned with a verdict that denied several requested aggravating circumstances and granted the subsection (e)(8) mitigating circumstances, further dispelling the notion of an inflamed jury rendering a verdict on passions rather than reason.   Given these circumstances of record, therefore, we find unavailing Appellant's claim that the prosecutor's opening remark rendered his penalty trial fundamentally unfair.

### V.     Precluding Witness Testimony Relating Appellant's Purported Statements of Remorse

Appellant next asserts that the lower court erred when it ruled his proffer of testimony from friends and family relating his recent statements of remorse did not qualify for admission as Pa.R.E. 803(1) (present sense impression) or 803(3) (then existing

---

[16] In most instances, the law presumes that the jury will follow the instructions of the court.  Commonwealth v. Rega, 933 A.2d 997, 1016 (Pa. 2007).

mental, emotional, or physical condition) exceptions to the Rule against Hearsay. Specifically, the trial court permitted the witnesses to testify as to their observations of Appellant during their meetings with him but not to the particular statements he made. N.T. at 1490. Barring the statements, Appellant contends, violated his rights not only under the rules of evidence themselves, but also under the 8th and 14th Amendments' mandate that reliable mitigation evidence, regardless of state evidentiary rules, be admitted as articulated in Chambers v. Mississippi, 410 U.S. 284, 300-01 (1973).

The Commonwealth responds that Appellant has waived his constitutional challenge for failure to raise it first before the trial court, as he limited his argument to their admissibility under the Pennsylvania Rules of Evidence, which, the Commonwealth continues, provided no pathway to admission in any event because the statements involved neither presently observed conditions or events as contemplated by Rule 801(1) nor observations of his contemporaneous emotions made in the absence of a motive to deceive, as required by Rule 803(3).

The following side-bar exchange comprises the entire discussion on the matter:

[Defense Counsel]: Your Honor, in chambers we just had a discussion regarding evidence that we wanted to present. We have represented to the Court that we have multiple witnesses including the current witness, Kim Topper; her husband, Roger Topper; the Defendant's cousin, Linda Yates: and sister, Brandy Johnson; among others who would testify that he has proclaimed to them on multiple occasions his remorse and his regret for what happened.

We're asking the Court to admit that under Rule 803(1), which would be present sense impression or under 803(3), which would be then existing emotional condition. We think are admissible -- those statements would be admissible under those exceptions to the hearsay rule.

[Prosecutor]: Your Honor, we're objecting to that because for a number of reasons, but it's hearsay and we don't think it goes to state of mind in this under these circumstances.

THE COURT: All right. The objection will be sustained. The defense is permitted to have witnesses describe objective observations of the Defendant. However, they may not testify as to statements made by him to them, that is hearsay, and it is not admissible and does not meet the exceptions outlined by the defense.

N.T. 6/18/12 at 1489-90.

Rulings on the admissibility of evidence, including evidence proffered at the penalty phase of a capital trial, are within the discretion of the trial judge, and such rulings will form no basis for appellate relief absent an abuse of discretion. Commonwealth v. Reid, 811 A.2d 530, 550 (Pa. 2002). See also Commonwealth v. Ragan, 645 A.2d 811, 818 (Pa. 1994) (noting the determination of whether hearsay, state of mind statements are admissible is within the sound discretion of the trial court and will be reversed only upon an abuse of that discretion).

A capital defendant at the penalty hearing may present relevant evidence in mitigation. 42 Pa.C.S. § 9711(a)(2); Commonealth v. May, 887 A.2d 750, 765 (Pa. 2005). Evidence is relevant to mitigation if it is probative of any of the enumerated mitigating circumstances set forth in 42 Pa.C.S. § 9711(e). Id. "Given the broad standard governing what qualifies as mitigation evidence, we have no doubt that a defendant's testimonial expression of remorse at the penalty phase could be deemed relevant to his character." May at 766.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c); Commonwealth v. McCrae, 832 A.2d 1026, 1034 (Pa. 2003). Rule 802 provides that, "[h]earsay is not admissible except as provided by these rules [the Rules of Evidence], other rules prescribed by the Pennsylvania Supreme Court, or by statute." Id. at 1034. Although we are not informed what statements, exactly, the proffered witnesses would have attributed to Appellant, we think it reasonable to infer from the counsel's motion to the court and Appellant's own testimonial expression of remorse at

penalty trial that the statements represented direct expressions of remorse, in the nature of "I'm sorry for what happened."  As such, Appellant's alleged statements were relevant to mitigation, but were also offered for their truth--indeed they were relevant only if used for that purpose--and thus clearly would have constituted hearsay.

On whether the statements were nonetheless admissible, the above excerpt from the penalty hearing shows defense counsel offered summarily that admission was required under state of mind exceptions to the rule against hearsay as articulated in Pa.R.E. 803(1) and (3).[17]  The court, however, rejected the proffer as failing to meet the exceptions, and defense counsel discussed the matter no further.  Counsel now contends that the court erred in precluding Appellant's statements of remorse through

---

[17] Rule 803, **Exceptions to the Rule Against Hearsay--Regardless of Whether the Declarant Is Available as a Witness**, provides in pertinent part:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> **(1) Present Sense Impression.** A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it. *Comment:* This rule is identical to F.R.E. 803(1).
>
> For this exception to apply, declarant need not be excited or otherwise emotionally affected by the event or condition perceived.  The trustworthiness of the statement arises from its timing.  The requirement of contemporaneousness, or near contemporaneousness, reduces the chance of premeditated prevarication or loss of memory.
>
> * * *
> **(3) Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Pa.R.E. 803(1) and (3).

friends and family because the statements were both relevant to the critical issue of mitigation in the penalty phase of trial and trustworthy, given they were (1) statements against interest, (2) spontaneously made to family, (3) corroborated by his own penalty-phase testimony, and (4) subject to cross-examination. We disagree, as counsel failed to edify the court sufficiently as to the trustworthiness component of the proffered testimony.

Apposite jurisprudence has denied categorical acceptance of hearsay testimony as to an out-of-court defendant's statement of remorse, requiring instead an additional measure of trustworthiness beyond that which springs from the temporal coordination of the statement and the remorseful emotion on which it remarks. In May, supra, the capital defendant sought to admit as mitigation the testimony of his victim's two adult daughters, who would have testified that defendant apologized and expressed remorse during their face-to-face meeting with them and in a three-page letter. The daughters, who were opposed to the death penalty, were willing and available to testify regarding Appellant's expressions of remorse, but the trial court ruled the hearsay proffer inadmissible without the additional assurances that cross-examination of the defendant would bring. We upheld the ruling, reasoning:

> The case *sub judice* is very similar to [Commonwealth v.]Young, [637 A.2d 1313 ([Pa.]1993)*]* in which the defendant also declined to testify on his own behalf during the penalty phase. In an attempt to present evidence of his remorse, the defendant there sought to introduce letters he had written to a member of a religious order concerning his case, but the trial court ruled that the letters were inadmissible hearsay. On appeal, this Court held that the trial court properly excluded the letters because the Commonwealth could not cross-examine the defendant regarding their content. This Court specifically noted that "to allow the letters into evidence would have been tantamount to granting [the defendant] the right of allocution ... [which right] has been abrogated and replaced by the statutory law which specifies procedures for sentencing for first-degree murder." Id. at 1322. The fact that the evidence here would have been admitted through testimony, whereas the evidence in Young would have been admitted through letters, makes no relevant difference. Both constitute hearsay. In both

circumstances, the defendants attempted to present favorable evidence while denying the Commonwealth an opportunity to challenge the statements through cross-examination. The trial court did not abuse its discretion and properly excluded the testimony of the victim's daughters.

May. at 887 A.2d 750, 765-66.

Unlike the defendants in May and Young, Appellant eventually testified regarding his remorse and would thus have been available for cross-examination as to his earlier statements allegedly made to the proffered witnesses. This fact, however, fails to take the case *sub judice* outside the ambit of May and Young, for, at the time defense counsel offered the hearsay testimony in question, counsel made no indication to the court that Appellant would later testify, let alone that he would testify as to his remorse. In death penalty cases, our standard of review is to review the court's evidentiary ruling *at the time it was made* for an abuse of discretion or error of law. Reid, supra. With the record revealing neither an indication by counsel that Appellant might testify, a request for a conditional ruling in the event he did, nor a resubmission of the motion when it became certain that he would, in fact, testify, we detect no abuse of discretion or error of law in an evidentiary ruling made consistently with the controlling precedent of May that such statements of remorse, unaccompanied by additional measures of trustworthiness, fail to gain admission under our evidentiary rules pertaining to state of mind exceptions to the rule against hearsay.

An alternate basis on which to support the court's refusal to admit the hearsay as a state-of-mind exception derives from a capital defendant's motive to affect remorse in out-of-court conversations with potential character witnesses who may then relay his ostensibly sympathetic statements to the penalty jury. "When the declarant's out-of-court statements demonstrate his state of mind, *are made in a natural manner*, and are material and relevant, they are admissible pursuant to the exception." Commonwealth v. Begley, 780 A.2d 605, 623-24 (Pa. 2001) (quoting Commonwealth v. Riggins, 478 Pa.

222, 234, 386 A.2d 520, 525 (1978)) (emphasis added). See also Commonwealth v. Lonwenberg, 392 A.2d 1274, 1279 (Pa. 1978) ("In addition to the necessity for [the state of mind] exception, the admission of this type of evidence is justified because the circumstances in which these utterances were made indicate that they accurately reflected the declarant's state of mind at that time and there was an absence of a motive to deceive.")

A capital defendant has motive to deceive when declaring his remorse, as the statement, if deemed credible, may advance his self-interest in mitigating punishment. This danger of surreptitious self-serving that may accompany the capital defendant's statement thus removes it from that class of statements whose reliability flows from a context showing the statement was naturally made. This is not to preclude the possibility that capital defendants may sincerely express remorse to others in extra-judicial conversations; it, instead, simply acknowledges that great pressures bearing upon the capital defendant to make potentially mitigating statements warrant both the conclusion that such statements are not "naturally made" for purposes of Pa.R.E. 803(1) and (3) and the corresponding requirement that the defendant testify on the issue of his remorse before a jury--who may then assess his sincerity in person and with the benefit of cross-examination--as a prerequisite to possible admission of hearsay statements of his remorse.

Even if the trial court had ascertained that Appellant would, in fact, testify as to his remorse--a circumstance neither alleged by Appellant nor appearing of record--such that exclusion of witnesses' hearsay testimony to that same effect constituted error, we would nevertheless deem the error harmless. Harmless error may be established in one of three ways: (1) the error did not prejudice the defendant or the prejudice was only *de minimis;* (2) the erroneously admitted evidence was cumulative of other properly admitted

evidence; or (3) the prejudicial effect of the error is so insignificant by comparison to the other evidence that it is clear beyond a reasonable doubt that the error could not have contributed to the jury's decision regarding the death penalty. Commonwealth v. Smith, 861 A.2d 892, 897 (2004) (internal citation and quotation marks omitted).

Here, Appellant personally expressed his remorse when he apologized to the Grove family from the witness stand. This was the clearest, most direct expression of remorse available as it gave the jury the opportunity to assess the sincerity of Appellant's statement. Moreover, the jury heard testimony from two faith ministers that Appellant presented as witnesses to his character. Specifically, Prison pastor Ronald Cordell testified that Appellant was a consistently devout and exemplary student at his prison bible lessons who desired instruction and conversation on forming a relationship with God and repentance. N.T. at 1527-28. Pastor Robert Herr also testified that Appellant displayed a level and complexity of religious searching consistent with genuine reflection and a legitimate attempt to gain an understanding of biblical teaching that made sense to him. N.T. at 1534-35. Herr testified as to his personal experience with so-called "prison conversions," wherein inmates feign newfound spiritual insight about their prior criminal lives for the sole purpose of obtaining favorable results in pending legal proceedings, but Herr differentiated Appellant's approach to and participation in the faith exercises he administered from the that typically practiced by charlatans. N.T. at 1535.

How these three accounts of Appellant's allegedly remorseful, reflective, and repentant state of mind provided materially different or inferior evidence on the subject as compared to the excluded proffer, Appellant does not explain and we do not perceive. We therefore deem harmless any error attending the exclusion of cumulative testimony as to Appellant's alleged remorse.

**VI.     Denial of Appellant's Motion to Quash the Aggravating Factor that Appellant Killed While in the Perpetration of a Felony**

Appellant next contends that the lower court erred in denying his motion to quash the aggravating factor that he killed while "in perpetration of a felony" under 42 Pa.C.S. § 9711(d)(6) when his underlying felony conviction was for Persons not to Possess a Firearm. "The only felonies that the legislature intended as aggravating circumstances," Appellant argues, "are the six serious felonies of robbery, rape, deviate sexual intercourse by force or threat of force, arson, burglary, and kidnapping[]" enumerated in the Crime Code's definition of "perpetration of a felony" at 18 Pa.C.S. § 2502(d). [18] Brief for Appellant at 31. This Court has rejected the identical claim in both Commonwealth v. Walker, 656 A.2d 90 (Pa. 1995) (holding jury may consider underlying felony conviction of criminal trespass as felony for purposes of Sentencing Code's § 9711(d)(6) aggravator) and Commonwealth v. Robinson, 877 A.2d 433 (Pa. 2005) (holding "felony" for purposes of (d)(6) are not those enumerated in Section 2502(d), but, instead, those contemplated in Crimes Code at 18 Pa.C.S. § 101 et seq.). Appellant declares, however, "the time is ripe for Robinson to be overruled[]" and, to that end, provides an argument that, he says, "reiterates the convincing textual and legislative history arguments advanced by the Robinson defendant…." Brief for Appellant at 31.

Indeed, as Appellant acknowledges, our decision in Robinson reaffirmed jurisprudence set forth in Walker that a jury may find an "in perpetration of a felony" aggravating circumstance, and that "felonies" for such a purpose are expressly defined in the Crimes Code at 18 Pa.C.S. § 101 et seq. We went on to reject the defendant's attempt to distinguish his argument from Walker's through incorporation of legislative history, which, he maintained, revealed how our Legislature's severance of the former

_____

[18] Section 2502(d) defines "perpetration of a felony" as "[t]he act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping."

death penalty statute to accommodate constitutional requirements espoused in the United States Supreme Court decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and reformation into present-day Crime Code's Section 2502 (murder statute) and Sentencing Code's Section 9711 (death penalty statute) inadvertently omitted importing into Section 9711 the definitional section of Section 2502 as a necessary component. Robinson, 877 at 446. Our General Assembly amended 42 Pa.C.S. § 9711 "on no less than five occasions" since our decision in Walker, we noted, and in no amendment did it alter the pertinent law as interpreted by this Court. Id. So, we held, was applicable the well-settled presumption of statutory construction that our interpretation was in accordance with legislative intent. Id. (citing 1 Pa.C.S. § 1922(4); Fonner v. Shandon, Inc., 724 A.2d 903, 906 (Pa. 1999)).

A vigorous dissent, authored by Justice Saylor, noted that the appellant had provided an extensive legislative history of Sections 9711 and 2502, together with a well-developed argument in support of limiting the Section 9711(d)(6) aggravator to the six enumerated felonies of Section 2502. A probing and comprehensive analysis of the original severance, subsequent amendments to the capital sentencing scheme, and the resultant incarnations and iterations of each Section followed, with the dissent ultimately opining that Section 2502(d) avoids ambiguity and "gains full meaning only when read in conjunction with the death penalty statute." Robinson, at 457. Conjoining the statutes in such a way as to limit felonies qualifying as an aggravator in sentencing, Justice Saylor opined, aligns perfectly with the United States Supreme Court's mandate that carefully defined, narrowing criteria apply as a threshold to death eligibility. Id. Two justices joined Justice Saylor in dissent.

In Robinson, therefore, this Court rejected zealous advocacy and robust dissent on the very same issue and argument that is now raised herein. Appellant concedes as

much when he states "[i]n Robinson, the defendant's arguments were substantially the same as the ones in this brief…." Brief for Appellant at 42.[19] We agree, and therefore deem Robinson binding precedent, particularly given Appellant's reiterations of the defendant's unavailing arguments made in that case. Furthermore, just as we inferred in Robinson an accordance between legislative intent and our prior interpretations of the law from the General Assembly's failure to alter the law subsequently, so we continue to infer accordance in our review of the case sub judice, where the General Assembly has left the law unaltered for nine years following the fully-developed treatment the issue received in Robinson. Accordingly, we dismiss this claim as meritless.

## VII. Admission of Victim Impact Evidence

Appellant next contends the court committed reversible error when it instructed the jury on the use of victim impact evidence, as the court's language allowed the jury to use victim impact as a super non-statutory aggravator. Appellant filed a pre-hearing motion seeking to preclude the Commonwealth from offering victim impact evidence. The lower court denied the motion, and the jury considered victim impact evidence in violation of Appellant's Eighth and Fourteenth Amendment rights, Appellant argues.

---

[19] Indeed, though Appellant points to an additional aspect of Section 2502 in support of his legislative history argument, this point is in no way transformative, as the nature of his challenge still mirrors the legislative history-based challenge that the Majority in Robinson dispatched. Appellant does argue elsewhere, however, that his case is factually distinguishable from Robinson because it involved a non-violent felony, whereas Robinson involved two violent felonies and a non-violent one. Appellant thus speculates that the violent nature of the two felonies in Robinson "may have been sufficient to convince the [C]ourt that Robinson's overall crime warranted a punishment of death, and therefore that the perpetration of a felony aggravating circumstance was in his case serving the narrowing function required by [United States Supreme Court jurisprudence]. Brief for Appellant at 43. Nothing in Robinson substantiates this theory, as we confined our opinion to the question regarding the statutory source of a "felony" as that term is used in the "perpetration of a felony" aggravating circumstance and determined the applicable definition comes from the Crimes Code at section 101: "What constitutes a felony in this Commonwealth is defined in the Crimes Code at 18 Pa.C.S. § 101 et seq."

Central to Appellant's claim is the proposition that the United States Supreme Court decision in <u>Payne</u>, <u>supra</u>, erroneously overturned prior decisions of the Court that held capital punishment must be based solely on evidence that tends to inform the jury about the nature of the offense and character of the defendant. <u>See</u> <u>Booth</u>, <u>supra</u>, and <u>Gathers</u>, <u>supra</u>. Quoting liberally from the dissent in <u>Payne</u>, Appellant argues that victim impact statements serve no purpose other than to appeal to the sympathies or emotions of the jurors. <u>Payne</u>, 501 U.S. at 856-57 (dissenting opinion of Stevens and Blackmun, JJ.). The testimony of Officer Grove's family offered no insight to either the nature of the offense or the character of Appellant and was therefore irrelevant, he maintains. Even if relevant, he offers in the alternative, the victim impact statements were "overwhelmingly more prejudicial than probative and should not have been admitted." Brief for Appellant at 45.

Appellant candidly acknowledges, however, that our Court has held the statutory authority at 42 Pa.C.S.A. § 9711(c)(2) to instruct a jury that it may consider victim impact evidence violates neither state or federal due process nor prohibitions against cruel and unusual punishment. <u>See</u> <u>Commonwealth v. Means</u>, 773 A.2d 143 (Pa. 2001). He maintains, however, that the standard jury instruction emanating from this provision and substantially followed by the lower court in charging the jury in the case *sub judice*, however, simply fails to provide adequate guidance on how to consider the victim impact statement *vis a vis* the Eighth Amendment, which requires more accuracy in and factual support for an instruction than would be required in a non-capital case. "On the one hand, the Court says the jury can give the evidence whatever weight they think it deserves, but on the other hand limits the jury to a 'rational inquiry into the culpability of defendant.' Is Appellant more culpable because the victim was loved by his parents? Less culpable because the victim was not yet married? Was Appellant more culpable

because of a community-wide outpouring of grief for the victim?   Less culpable because the victim had not yet had children?" Appellant asks, referencing argument from the hearing at N.T. 1437-1464. Brief of Appellant at 46.

The Commonwealth dismisses this claim as meritless because this Court has approved not only the use of victim impact statements but also the substantially same instruction that the court used in the case *sub judice*. See Means, supra**.**

Our standard of review for penalty phase jury instructions is the same as that which guides us in reviewing a guilt phase jury charge.   In reviewing a challenge to a jury instruction, the entire charge is considered, not merely discrete portions thereof. Commonwealth v. Eichinger, 915 A.2d 1122, 1138 (Pa. 2007).   The trial court is free to use its own expressions as long as the concepts at issue are clearly and accurately presented to the jury. Id.   It is the policy of this Court to give our trial courts latitude and discretion in phrasing instructions. Id.

The trial court gave the following instructions regarding victim-impact testimony:

However, if you find at least one aggravating circumstance and at least one mitigating circumstance, you may then consider the victim and family impact evidence when deciding whether or not the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances.

Each of you may give the family and victim impact statements whatever weight you think it deserves.   Your consideration of this evidence, however, must be limited to a rational inquiry into the culpability of the Defendant and may not be an emotional response to the evidence which was presented.

N.T. 10/4/12 at 1848-49.

We agree with the trial court that Appellant's challenge against the above instruction, which aptly covered accepted law on a jury's consideration of victim impact statements, has no merit.   Appellant relies exclusively on positions that have been considered extensively by both the United States and Pennsylvania Supreme Courts and

relegated to dissenting opinion status. Nor does Appellant identify a growing trend of decisional law departing from such jurisprudence to warrant reconsideration of precedent. We therefore reject this claim.

## VIII    Denied Request for a Residual Doubt Instruction

Appellant next charges reversible error with the trial court's refusal to instruct the jury during the penalty phase that residual doubt could be considered as a mitigating factor. Appellant acknowledges that no such request for the instruction appears of record, but was made and denied, instead, in chambers, as confirmed by the trial court in its Pa.R.A.P. 1925(a) opinion. Appellant also acknowledges decisions of both the Supreme Court of the United States and this Court denying a constitutional right in a capital defendant "to an instruction telling a jury to revisit the question of his guilt as a basis for mitigation." Franklin v. Lynaugh, 487 U.S. 164, 173 (1988). Accord Commonwealth v. Fletcher, 750 A.2d 261, 277 (Pa. 2000).

A shift towards the introduction of residual doubt and a subsequent jury instruction, however, has occurred, Appellant says. Citing a 2001 federal district court decision from Louisiana[20] holding such evidence and an instruction are entitlements under the statutory construction of 18 U.S.C. § 3592 because it allows for a non-exclusive list, Appellant draws the analogy that the similarly open-ended Section 9711(e)(8) "catch-all" mitigator likewise entitles a defendant to argument and instruction on residual doubt. Moreover, Appellant cites to Commonwealth v. Meadows, 787 A.2d 312 (Pa. 2001) as an instance in which this Court recognized the residual doubt argument as a reasonable trial strategy in arguing against the death penalty. See id at 321 (holding counsel's emphasis on lingering or residual doubt jurors may have had about defendant's guilt was reasonable penalty hearing strategy in case where grounds existed for counsel's belief

---

[20] U.S. v. Davis, 132 F.Supp. 2d 455 (E.D.La. 2001).

that defendant was poor witness and other witnesses were lacking). One year later, this Court in a PCRA appeal held defendant's counsel could not be deemed ineffective for presenting a residual doubt argument. See Commonwealth v. Fisher, 813 A.2d 761 (Pa. 2002). This trend establishes, Appellant argues, that "the trial judge erred in not instructing the jury during the penalty phase that residual doubt is an appropriate mitigating factor." Brief for Appellant at p. 48.

The Commonwealth retorts, initially, that this claim is waived for Appellant's failure to place his request for the instruction on the record. See Commonwealth v. Spell, 28 A.3d 1274, 1280 (Pa. 2011) (imposing waiver where defendant failed to ensure that discussions of issue in lower court were preserved in the record). In any event, the Commonwealth argues alternatively that controlling jurisprudence has held, contrary to Appellant's assertion, "there is no constitutional requirement that a convicted murderer be permitted to argue residual doubt concerning guilt as a mitigating factor." Means, supra at 158-59 (discussing Lynaugh, supra). A more recent pronouncement of this Court marked not a trend toward recognizing residual doubt entitlements but, instead, a reaffirmation against a right to such evidence presentation, argumentation, and instruction. See Commonwealth v. Edmiston, 851 A.2d 883, 895 (Pa. 2004) ("Residual doubt is not a statutory mitigating circumstance and, as noted, given its statutory irrelevance, it is not clear that appellant should have been permitted to present this sort of evidence/argument at all."). Finally, the Commonwealth notes that the court did not limit the presentation of residual doubt evidence, it was Appellant's election not to present it.

A trial court's denial of a request for a jury instruction is disturbed on appeal only if there was an abuse of discretion or an error of law. Commonwealth v. Galvin, 985 A.2d 783, 798-799 (Pa. 2009). We discern no such infirmity with the court's denial here, as it was consistent with prevailing law on the topic recognizing no right to a jury instruction on

residual doubt, a non-statutory mitigator. Appellant's argument purportedly heralds a trend in decisional law toward the recognition of such rights, but several decisions rejecting ineffective claims that assailed counsel for advancing a residual doubt-based mitigation theory does not a revolution make. The decisions were, instead, merely a product of our review under the ineffectiveness rubric and its three-prong test wherein we discerned no unreasonable trial strategy given the particular facts of the case. The decisions did not concomitantly recognize a defendant's right to a jury instruction identifying residual doubt as a mitigating factor. Accordingly, this claim is meritless.

## IX.    Denial of Motion to Suppress Inculpatory Statements

Appellant next argues that the lower court erred in denying his motion to suppress his statements recorded in an ambulance while hypothermic, dehydrated, under the influence of morphine,[21] in pain, and having heard the police ask medical staff to withhold pain medication until Appellant was interviewed. This confluence of adverse effects overbore his ability to give a voluntary statement and critically impaired his capacity for self-determination, Appellant asserts, thus making the admission of his statement a violation of his Fifth and Fourteenth Amendment guarantees.

For the 11 1/2 hours between the time of the shooting until his arrest the following morning, Appellant says, he experienced severe pain from the bullet lodged in his hip, cold, thirst, little sleep, and the "stark absence of friends, relatives or legal counsel before the police arrived to interrogate him." Brief of Appellant at 51. These dire circumstances, he continues, composed the prelude to a mentally coercive interrogation punctuated by an officer's request of the paramedic to withhold administering morphine to Appellant until

---

[21] Though Appellant initially refers to a morphine-induced statement, the crux of his argument with respect to the administration of morphine is that it was the withholding of the medication until he completed his statement--and the mental and physical anguish such prolonging of his pain caused--that rendered his statement an invalid product of coercion.

a recording of Appellant's incriminating statement could be obtained. Compounding this effect was the fact Appellant heard he was to be denied morphine until the statement was obtained, Appellant continues. "To the patient experiencing severe pain, this denial of medication constituted psychological coercion, at the very least, and is precisely the type of situation that mandates the court to consider statements taken in medical settings as 'extremely suspect.'" Brief of Appellant at 50-51.

Appellant analogizes his deprivation of pain medication during interrogation to that of the defendant in Commonwealth v. Perry, 379 A.2d 545 (Pa. 1977). Hospitalized with a gunshot wound, fed intravenously, and coping with the discomfort of a catheter, Perry asked for, but was denied, pain medication during his interrogation. He had not seen friends or family for over 12 hours and was under visible police guard. Id. at 547. These facts led this Court to throw out the confession, which was not, we held, "the product of an essentially free and unconstrained choice." Id. Cited additionally for the same proposition is Commonwealth ex rel Gaito v. Maroney, 220 A.2d 628 (Pa. 1966), wherein the Court deemed an admission involuntary where obtained four hours post-surgery and after administration of demerol, despite the district attorney's testimony that defendant did not seem impaired. A unanimous court, Appellant states, based its decision "not only on the lack of rational choice on the part of appellant but also on 'a strong conviction that our system of law enforcement should not operate so as to take advantage of a person in this fashion.'" Id. at 632 (quoting Blackburn v. State of Alabama, 361 U.S. 199, 208 (1960)). Even though it was "quite possible that the challenged confession may have been obtained while appellant was completely lucid and mentally competent[,]" Maroney reasoned, "our judgment as to the effect of the circumstances under which the confession was obtained upon appellant's mental capacity to confess must by its nature be one

based upon probabilities." Maroney at 631. In much the same way, even if it were possible that he was completely lucid and mentally competent, Appellant submits, the confluence of circumstances makes that possibility too small to serve as a basis for the admission of his statement.

His case compares favorably to the hospitalization cases above, Appellant says, because, unlike those defendants, who were at least receiving medical treatment at the time, he had not yet come under the care of a physician when his statement was taken. Instead, he lay handcuffed to a stretcher and surrounded by two police officers, one of whom asked paramedics to delay pain relief until a statement was recorded. Moreover, Appellant contends, his case is distinguishable from jurisprudence that a suspect's wounded condition necessitating hospital care does not automatically render a confession involuntary. Though we held in Commonwealth v. Johnson, 727 A.2d 1089 (Pa. 1999), that displaying the 'presence of mind in fabricating a story about his shooting' designed to mislead police revealed a will uncoerced in the hospitalized defendant and, thus, a statement voluntarily rendered, Appellant notes no such deliberate falsification exists in the case *sub judice*. His attempt to hide his vehicle occurred immediately after the shooting and was far too remote in time from his statement given eleven hours later to lend insight into his state of mind at that time. In sum, given the totality of circumstances surrounding his statement obtained in the ambulance, admission of the statement violated his constitutional rights and should have been suppressed by the lower court, Appellant posits.

The Commonwealth responds that the testimonial evidence adduced at the suppression hearing dispelled any concern Appellant's recorded confession was the product of coercion. Pennsylvania state troopers arriving at the scene immediately called for emergency assistance upon seeing a wounded Appellant and interviewed a

lucid and responsive Appellant in accordance with the dictates of Miranda during the 14-minute wait for an ambulance, the Commonwealth argues. Appellant freely confessed during this time, the argument continues, and the interview stopped shortly thereafter when the ambulance arrived to allow paramedics to prepare Appellant for transport to York Hospital.

Knowing a tape recorder was then recording all comments, Appellant answered the paramedic's questions clearly, indicating he had been shot in the right hip during the night, the Commonwealth notes. Interrogation resumed only after the EMT's ten minute medical assessment of Appellant, during which time he obtained Appellant's medical history, determined the status of the gunshot wound appeared to be stable, as it was no longer bleeding, applied a bandage to the hip, and placed heat packs on the IV tube in response to Appellant's report that he was cold.

Contrary to Appellant's assertion, the Commonwealth maintains, pain relief in the form of IV morphine was not delayed pending Appellant's provision of a confession. The record establishes, instead, that Trooper Navitsky asked the paramedic if he could have five minutes to interview Appellant before morphine was given, and the EMT agreed, as that represented the time it would take the EMT to prepare for, and receive a physician's approval for, administration of morphine anyway. N.T. at 33-47, 198. Trooper Navitsky indicated he only wanted to put on the recorder the substance of the conversation he and Appellant had before the ambulance arrived. N.T. at 198. Recordation of Appellant's statement ensued and morphine was thereafter administered intravenously within the five-minute time frame.

As for the recorded statement itself, the Commonwealth argues, Appellant answered all questions pertaining to his knowledge of Miranda rights and his culpability in the shooting freely, clearly, and candidly. He knew the day of the week, denied having

taken illicit drugs, and then offered a detailed account of spotlight hunting, the deadly confrontation with Officer Grove and subsequent flight from the scene, and his night alone in the woods, which, he said, gave him time to think and feel remorse for the killing.

Then asking Trooper Navitsky to pause the recorder and informing him of Ryan Laumann's alleged involvement in another crime, the Commonwealth offers, further revealed Appellant was neither physically nor psychologically overwhelmed but was, instead, capable of rationale, independent, goal-oriented thought calculated to improve his lot in a difficult circumstance. Also noted by the Commonwealth is that treating paramedics testified Appellant was "stable, conscious, alert, oriented, and acting and conversing appropriately." Brief of Appellee at 45. They observed no change in Appellant's demeanor or mental status after he received five milligrams of morphine,[22] nor did they observe any evidence of hypothermia, dehydration, or severe blood loss on the part of Appellant, the Commonwealth recounts. N.T. at 50, 57, 58-62, 114-116, 120, 146-48.

These impressions were consistent, it is argued, with those of trauma surgeon Dr. Kern Michael Hughes, who determined Appellant was stable and his vital signs and mental status were normal. No surgery was necessary for what he discerned as a fairly superficial, minor gunshot wound to the right hip area, nor did he detect any sign of hypothermia or dehydration, the Commonwealth notes. Additionally noteworthy in this regard, the Commonwealth says, is that Dr. Hughes discharged Appellant only several hours after arrival.

---

[22] As to the effects of this dose of morphine, the Commonwealth also alludes to the suppression hearing testimony of Dr. Ward Donovan, Chief of Toxicology at the Pinnacle Health System, who, based on clinical findings of the case coupled with his own pharmacological findings, "determined that the administration of five milligrams of morphine in this case to Appellant between 10:10 a.m. and 10:25 a.m. would have minimal or no impact whatsoever on his cognitive functioning." Brief of Appellee at 46.

Finally bearing on the voluntariness of his statement, the Commonwealth adds, is evidence that Appellant continued to cooperate with law enforcement after his hospital discharge, showing them, in person, "the path he had taken the previous night and the general area in which he had disposed of his weapons." Brief of Appellant, p. 46, citing N.T. 224-229.

The trial court explained its order denying Appellant's motion to suppress his statement as follows:

> The cornerstone of Defendant's challenge is his claim he was suffering from various medical infirmities at the time of his statement; however, his various claims of illness are not supported by the record. Medical professionals consistently indicated that during the examination at the scene, and subsequently at the hospital, there were no physical symptoms evidencing that Defendant suffered from dehydration, hypothermia, or significant blood loss. In addition, Commonwealth presented credible expert testimony corroborating the paucity of any evidence that the medical infirmities complained of ever existed. Defendant's expert's opinion to the contrary is unconvincing. While it is true Defendant complained of pain to emergency first responders, his primary initial complaint related to the tightness of the handcuffs rather than the bullet wound to his hip. Once the handcuffs were released, Defendant subsequently expressed pain only in response to questioning by medical professionals. Indeed, the totality of the circumstances establishes that the pain suffered by Defendant, if any, did not interfere in any way with his ability to understand, process, and intelligently respond to police questioning. Defendant's condition was not so impaired as to render him incapable of voluntarily waiving his rights or describing the incident that resulted in his custody.
>
> \*\*\*
>
> Defendant argues that despite manifestations of a cooperative, voluntary statement, his physical and psychological condition was impaired to the extent he was incapable of understanding and intelligently waiving his rights. Unfortunately for Defendant, the evidence at the suppression hearing does not support his claim. All medical and law enforcement personnel coming into contact with Defendant during the time period related to the interview testified Defendant was cognizant of time and place. Moreover, his statement evidenced the ability to recall and relate recent and distant past events. Defendant accurately related information and provided rational answers to the proposed questions. At one point during the discussion, Defendant requested to have the recorded portion of the

interview suspended while he discussed a matter implicating another in criminal conduct. His ability to process such a consideration demonstrated the complexity of his thinking. These facts confirm Defendant had sufficient cognitive awareness to understand his <u>Miranda</u> warnings and intelligently waive his rights.

Trial Court Findings of Fact and Conclusions of Law, filed 11/16/11 at 11-12.

In reviewing a suppression court's denial of a suppression motion,

we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous.

<u>Commonwealth v. Jones</u>, 988 A.2d 649, 654 (Pa. 2010) (citing <u>Commonwealth v. Bomar</u>, 826 A.2d 831, 842 (Pa. 2003)). Nonetheless, we exercise plenary review over the suppression court's conclusions of law. <u>Id</u>. (citations omitted).

"There is of course no single litmus-paper test for determining a constitutionally impermissible interrogation. Rather, the ultimate test of voluntariness is whether the confession is the product of an essentially free and unconstrained choice by its maker. 'If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.'" <u>Commonwealth v. Hallowell</u>, 282 A.2d 327, 329 (Pa. 1971) (quoting <u>Culombe v. Connecticut</u>, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961)). Thus we must consider the totality of the circumstances, including the accused's mental and physical condition. <u>Id</u>.

In <u>Perry</u>, <u>supra</u>, this Court addressed the voluntariness of a confession made by a defendant who, like Appellant, was at the time of his interrogation undergoing medical

treatment and observation for a gunshot wound. In concluding Perry's statement was involuntarily made, we found dispositive the following facts:

> Thirteen hours after his arrest, the detective informed appellant of his constitutional rights and appellant indicated that he would give a statement. The interrogation continued for about one hour and twenty minutes, until 11:15 a. m. During this time appellant gave and signed an incriminating statement.
>
> During the interview appellant was lying in bed and was alone in the room with the interrogating detective. During the interview he complained to the detective of pain and was experiencing discomfort from a catheter inserted through the penis into the bladder in order to monitor for any abnormal bleeding indicating injury to the bladder, urinary tract or kidney. At one point during the interview, when the appellant complained of pain, he asked the detective to call the nurse. When the nurse arrived, the appellant informed her that he was in pain and wanted some type of medication. Medication, however, was refused. Throughout the interview, appellant was being fed through an intravenous tube. The catheter remained in the appellant for over two days and the intravenous feeding continued constantly for about four days. At one point during the interrogation, appellant was asked by the detective if he wanted to continue the interrogation and the appellant answered that he "didn't care."

Id at 546-47.

Appellant offers Perry as controlling authority given the facts of his case, but it is readily apparent that key differences exist between the factual scenarios of each case so as to distinguish them. Whereas Perry was admitted to the intensive care unit for a gunshot wound to the chest, gave his statement to an interrogator who kept him isolated for one hour and twenty minutes in a small cubicle, complained of pain during the interrogation to the point of calling for a nurse to administer pain medication, and was, in fact, intentionally denied pain medication until he completed his statement, Appellant was subject to a recorded statement lasting five minutes and taken in the company of paramedics who agreed Trooper Navitsky had only that amount of time before morphine would be administered. As such, Appellant had no reason to believe his pain medication

had been denied; in fact, the tape recorder captured his response of "that's fine" when the necessary wait time before morphine would be given. See Trial Court's Findings of Fact and Conclusions of Law, supra at 15. Moreover, Appellant would have also noticed Trooper Navitsky had yielded silently to paramedics for approximately ten minutes as they initially cared for Appellant and prepared him for transport, had asked permission to record Appellant's statement, and had explained he needed only a short time to record a statement that Appellant had already given before the ambulance had arrived. These circumstances do not connote a psychologically coercive environment.

Relevant, as well, to our inquiry is Appellant's demonstrated presence of mind to ask Trooper Navitsky to turn off the recorder at one point to allow him to relate information incriminating Ryan Laumann in another crime. Made presumably in an attempt to cooperate with authorities in exchange for lenient treatment, Appellant's offer further evidenced not a coerced mind overborne with pain and intimidation but, instead, a freely calculating mind exploring ways to secure a more favorable result for himself. We liken the import of Appellant's interrogation response in this regard to the falsified story offered by the defendant in Commonwealth v. Johnson, 727 A.2d 1089 (Pa. 1999) to mislead a police investigation into his shooting. As we inferred from the presence of mind to lie in such circumstances a retained capacity to respond voluntarily to an interrogator, so, too, do we infer from Appellant's display of initiative in spontaneously departing from Trooper Navitsky's script to offer information and cooperation in the investigation of an unrelated crime an unconstrained mind engaged in independent thinking and voluntary discourse.

With respect to the question of whether the compromising effect of physical pain on one's ability to offer a voluntary statement may have played a role here, Appellant's

case is further distinguishable from Perry, given testimonial evidence from treating health care providers as to the limited extent of injury and physical difficulty experienced by Appellant at the time of the statement. Treating paramedics and Dr. Hughes all denied observing symptoms of hypothermia, dehydration, or compromised mental status in Appellant at the time during or immediately after his statement. Unlike in Perry, therefore, the invalidating suspicion that substantial physical pain and its diminishing effect on one's will to resist the influence of others simply fails to arise under the medical testimony adduced at Appellant's suppression hearing.

Finally, Appellant's provision of a voluntary statement was further substantiated by evidence pertaining to the hours following his discharge, where in an apparent continuation of his willingness to cooperate with authorities he accompanied them back to the scene of the crime and retraced his steps taken before, during, and after he committed his fateful act. For all the foregoing reasons, therefore, we discern neither an abuse of discretion nor an error of law in the suppression court's determination that Appellant's recorded confession was the voluntarily made product of an essentially free and unconstrained choice to tell Trooper Navitsky about his role in the killing of Officer Grove.

**X:    Admissibility of Guilt-Phase Proffer of Alcohol Consumption History**

In Appellant's final enumerated issue, he argues that the court erred in refusing to permit testimony from witnesses regarding his alcohol consumption habit, or more precisely, evidence of his ostensible alcoholism, as it existed prior to the criminal incident as corroborative evidence to his guilt phase voluntary intoxication affirmative defense. Specifically, Appellant sought to introduce testimony from his mother, Kimberly Topper,

that: she had found a case of empty beer cans and four to six bottles of alcohol in his bedroom one week before the murder; Appellant had come down from his bedroom one morning, also about a week before the murder, smelling of alcohol and saying he had only drunk one or two beers; and his girlfriend, Leslie Filer, had expressed concern about Appellant's alcohol use, to which Topper explained he had a family history of alcoholism. Also proposed was testimony from Ms. Filer herself as to Appellant's recent bank statements reflecting purchases from a local restaurant in the two week period leading up to the murder. Though the statements did not indicate what was purchased, Ms. Filer would testify the transactions were for alcohol. N.T. at 899-904, 943.

The trial court excluded Mrs. Topper's proposed testimony on relevancy and hearsay grounds. Neither her testimony about discovering bottles in his bedroom nor her observation of Appellant's condition one week or so before the murder was sufficiently connected to the date of the incident, the court found, rendering each irrelevant. N.T. at 900. Not only were Ms. Filer's prospective interpretations of bank statements in the weeks before the murder also irrelevant to the issue of Appellant's state of mind at the time of the murder, the court ruled, they were also speculative because there was no way to ascertain what percentage of the purchases went for food as opposed to alcohol. N.T. at 945. As for Topper's account of Ms. Filer's concerns, moreover, the court excluded it on grounds it consisted of an out of court declarant's statement offered for the proof of the matter asserted and thus constituted inadmissible hearsay. N.T. at 902.

According to Appellant, the ruling of the trial court that evidence of general consumption of alcohol was irrelevant because it was insufficient by itself to support a

defense of voluntary intoxication and other evidence existed that Appellant drank on the day of the murder was erroneous. In fact, Appellant contends, in so ruling, the trial court substituted its judgment for that of the jury as to the weight of the evidence, rather than actually making a relevancy determination, and thereby usurped the jury of its exclusive role of determining credibility of witnesses and assessing weight to their testimonies.

Under Pa.R.E. 402, Appellant argues, the proper relevancy analysis required a determination as to whether the evidence about Appellant's apparent alcoholism made more or less probable the already admitted testimony of Appellant's drinking and the effects thereof. This excluded corroborative evidence, Appellant reasons, would have lent credibility to his out-of-court statement, admitted through the testimony of admitting/treating physician Fazila Lalani, M.D. of York Hospital that his alcohol consumption on the day of the murder consisted of twelve beers. N.T. at 896. Because the amount of alcohol he consumed on the day of the murder was a matter in factual dispute, Appellant asserts,[23] evidence of his purported alcoholism would have made it more likely that the higher number he reported to Dr. Lalani was the accurate one, thus making the proffer highly relevant and probative. In this vein, Appellant concludes, the evidence could have resonated with the common understanding regarding the nature of alcoholism and "could easily [have led]" the jury to conclude that Appellant's brain was

_____

[23] For example, Appellant notes, Trooper Navitsky told the jury that Appellant reported having drunk two or three beers prior to the shooting and Trooper Michael Weaver testified that one empty Bud Light can was found at the deer poaching scene and another at the scene of the shooting. Dr. Lalani testified that Appellant self-reported drinking twelve beers on the day in question, while Ryan Laumann testified Appellant was "tipsy and buzzed' from alcohol at 4:00 p.m. and then drank six or seven more beers in his company before the shooting.

likely "overwhelmed or overpowered" for purposes of the voluntary intoxication defense. Brief for Appellant at 56.

The Commonwealth responds that this Court has previously rejected this very type of appeal that alcohol consumption at times removed from the moment of murder is relevant to an assessment of the state of mind element to First Degree Murder. In Spotz, supra, we reviewed a PCRA claim that trial counsel was ineffective for failing to call witnesses who collectively would have testified as to the defendant's chronic drug use, his intoxication from cocaine use some twelve hours after the early morning murder, and his apparently high state about two to three hours after the murder. We dismissed the testimony as irrelevant to a voluntary intoxication defense: "[n]one of this testimony remotely suggests that Appellant was at all intoxicated by drugs or alcohol at the time of Ms. Gunnet's murder, much less that he was so intoxicated as to be overwhelmed to the point of losing his faculties and sensibilities and unable to formulate a specific intent to kill[,]" we reasoned. Id. at 91-92. Here, quite similar to Spotz, the Commonwealth contends, none of the proffered witnesses saw Appellant consume alcohol, or otherwise had information concerning his alcohol consumption at or near the time of the murder.

> The overriding principle in determining if any evidence [ ] should be admitted involves a weighing of the probative value versus prejudicial effect. We have held that the trial court must decide first if the evidence is relevant and, if so, whether its probative value outweighs its prejudicial effect. Commonwealth v. Hawk, [ ] 709 A.2d 373, 376 ([Pa.] 1998). This Commonwealth defines relevant evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. Relevant evidence may nevertheless be excluded "if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Pa.R.E. 403.

Commonwealth v. Serge, 896 A.2d 1170, 1177 (Pa. 2006).

To have prevailed in his voluntary intoxication defense, Appellant was required under our law to inject reasonable doubt in the Commonwealth's proof that he had murdered Officer Grove with the specific intent to kill. This could be accomplished by establishing he possessed a diminished capacity at the time of the crime:

> A diminished capacity defense does not exculpate the defendant from criminal liability entirely, but instead negates the element of specific intent. For a defendant who proves a diminished capacity defense, first-degree murder is mitigated to third-degree murder. To establish a diminished capacity defense, a defendant must prove that his cognitive abilities of deliberation and premeditation were so compromised, by mental defect or voluntary intoxication, that he was unable to formulate the specific intent to kill. The mere fact of intoxication does not give rise to a diminished capacity defense. [Rather, a defendant must] show that he was overwhelmed to the point of losing his faculties and sensibilities to prove a voluntary intoxication defense.

Spotz at 90-91.

We agree with the Commonwealth's position that the case *sub judice* comes squarely under our holding in Spotz, which declared that evidence of chronic drug use or intoxication at times other than the time of the murder is irrelevant to a voluntary intoxication defense:

> Appellant cites the PCRA testimony of numerous witnesses who presented evidence concerning his chronic and acute drug use, as we summarize in the paragraph below. It is important to emphasize that none of the witnesses who testified at the PCRA hearing actually saw Appellant or had information as to his drug use at the time of Ms. Gunnet's murder, which is the only time that is relevant.

Id. at 91. As we held in Spotz with respect to the relevancy of evidence pertaining to the defendant's chronic and acute drug use at times other than the time of the murder, so, too, do we hold here that evidence of Appellant's allegedly chronic alcohol use and possibly heavy use within a week of the murder bore no relevance to the question of

whether he was intoxicated at the time he killed Officer Grove, much less to whether he was so intoxicated as to be overwhelmed to the point of losing his faculties and sensibilities and unable to formulate a specific intent to kill. See Spotz at 92. To that latter point, the eyewitness testimony of Ryan Laumann, as recounted supra, provided numerous detailed examples of how Appellant demonstrated control of his faculties and sensibilities during "the only time that is relevant," i.e., the hours leading up to and including time of the murder. This testimony refuted the notion of a diminished capacity, and Appellant could not have reasonably overcome it with irrelevant evidence pertaining to a different period of time. Accordingly, we discern no manifest unreasonableness or abuse of discretion in the court's evidentiary ruling excluding alcohol consumption history evidence.

### XI. Passion, Prejudice, and Arbitrariness Review

Though Appellant raises no specific argument under this final topic, we are required to conduct an independent penalty review pursuant to 42 Pa.C.S. § 9711(h)(3), which provides that "[t]he Supreme Court shall affirm the sentence of death unless it determines that : (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d)." Our careful review of the record leads us to conclude that Appellant's sentence of death was not the product of passion, prejudice, or any other arbitrary factor, but was, instead, based on the overwhelming evidence establishing that he fatally shot Officer Grove with the specific intent to kill. The parties did not dispute, moreover, that evidence supported application of the Section 9711(d)(1) aggravating circumstance of taking the life of a law enforcement officer while

acting in the line of duty. Accordingly, we hereby affirm Appellant's convictions and sentence of death.[24]

Former Justice McCaffery did not participate in the decision of this case.

Mr. Chief Justice Castille and Mr. Justice Eakin join the opinion.

Mr. Justice Saylor files a concurring opinion.

Mr. Justice Baer files a concurring and dissenting opinion in which Madame Justice Todd joins.

---

[24] The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. See 42 Pa.C.S. § 9711(i).