J-A08036-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ANDRE BRANCH-SAMUELS | : | |
| | : | |
| Appellant | : | No. 548 WDA 2018 |

Appeal from the Judgment of Sentence Entered January 10, 2018
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0006189-2016

BEFORE: PANELLA, P.J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED JULY 26, 2019**

Andre Branch-Samuels appeals the judgment of sentence entered on his convictions for first-degree murder, firearms not to be carried without a license, and tampering with or fabricating physical evidence.[1] We affirm.

We glean the following facts and procedural history from the certified record. On April 1, 2016, Dontae Thompson was shot multiple times while driving his vehicle by someone driving a white Ford Focus. N.T., Trial at 6. Police recovered two surveillance videos, which were introduced at trial as Commonwealth Exhibits 23 and 40. Exhibit 23 was a video of the shooting; Exhibit 40 showed an unidentified male parking a Ford Focus and the driver leaving with a male. Detectives Gary Messer and Judd Emery identified the male in Exhibit 40 as Branch-Samuels. He was arrested and charged.

---

[1] 18 Pa.C.S.A. § 2502(a), 6106(a)(1), and 4910(1), respectively.

Before trial, Branch-Samuels filed a Motion in *Limine* to preclude Detective Messer from testifying that Branch-Samuels was the male in Exhibit 40 because such testimony would be "an opinion based on a piece of evidence that he's looking at." Pre Trial Motions Hearing, 9/29/17, at 8. The trial court denied the motion and ruled that Detective Messer could "testify as to his knowledge of Mr. Branch-Samuels, how he knows him, and [defense counsel] can cross-examine him on it." *Id.* at 10. Following a motion to reconsider, the trial court reiterated the same ruling:

> [Commonwealth]: [Detective Messer] told the other detectives that that's [Branch-Samuels]. He identified him as Andre Branch-Samuels. Can he say that?
>
> The Court: Yes, I believe he can. Not while he is narrating the video. I think after the jury has a chance to view the video, because it is their determination that prevails. That's the ultimate finding. But this officer can say, based on my interactions with him in the community over a period of time, my knowledge of what he looked like at that time, I told the other officers the person that I saw in the video was [Branch-Samuels], and we took steps to get him.
>
> What he can't do is tell the jurors, while they are watching the video, this is Mr. Branch-Samuels, because that's a conclusion that he is making. He is making an investigative conclusion, which is different than a conclusion to a jury when he is testifying, I believe.
>
> So what he did as a result of viewing the video, and why, he can testify to that.

N.T., Pretrial Motions Hearing, October 10-11, 2017, at 9-10. It further explained its ruling as follows citing **Commonwealth v. Brown**, 134 A.3d 1097 (Pa.Super. 2016):

- 2 -

The Court: . . . As I've already ruled, my understanding of the law at this point is that a witness cannot speculate as to what he sees in the video. However, he can testify, based on his personal knowledge, training and experience, as to what he is seeing in the video. Whether that goes to a realtime identification of a person in the video, while he is watching the video, I've said I don't think he can do that. But I think he can state what he did as a result of watching the video in furtherance of the investigation. And that is to tell the other officers this is so and so, I've interacted with him.

[Defense Counsel]: I'm not seeing the distinction.

The Court: Because the distinction is right here in **Brown**, paragraph 11: Trial court sustained an objection prohibiting the detective from speculating as to the identity of individuals seen in the footage and instructed the jury that their own observations controlled.

So, it is their own observations of what the video depicts, whether or not that is consistent with the actions that the police took. It is the jury's determine of what they view in the video and whether or not it is your client or not.

*Id.* at 12-14.

At trial, the Commonwealth presented the following evidence. Detective Edward Fallert testified that he was one of the first detectives at the scene of the shooting. While there he was contacted by the public safety coordinator for the Pittsburgh Housing Authority, Jade Burka, who told him that he had obtained surveillance footage of the shooting, *i.e.*, Exhibit 23. After viewing the video, Burka determined that the shooter was driving a white Ford Focus; he also obtained the license plate number. With this information, Detective Fallert learned that Jenea Price had rented the vehicle on the day in question from Enterprise Rent-A-Car. Detective Messer also watched the video and recognized a male named Shawn Yancey. Police brought Yancey to the police

station and Yancey handed over the keys to the Ford Focus. N.T. at 186-187, 525. After speaking with Yancey, Detectives Messer and Emery located the Ford Focus in a parking lot. Additionally, police seized Yancey's cell phone as evidence and Detective Emery found on it a photo taken a day before the murder, depicting Yancey, Branch-Samuels, and another male. Yancey was wearing the same clothing in the photo as he was wearing the day of the murder. *Id.* at 663-65.

Detectives also recovered surveillance footage of the parking lot where they found the Ford Focus, *i.e.*, Exhibit 40. Detective Emery in his testimony at trial described the contents of the video as follows:

> The white car comes in, driven by a person that I recognized as Shawn Yancey. It pulls into a spot and another individual gets out of the back of the gray car that followed it in there. An individual gets out of the back of that car goes over and talks to Yancey then walks back over and gets in the car and Yancey turns the car around.

*Id.* at 219.

Detective Messer testified that when he viewed the video, he also recognized Yancey in the video. He testified that from his prior dealings with Branch-Samuels he knew that Yancey associated with Branch-Samuels. *Id.* at 167, 173. He also testified that he recognized Branch-Samuels in the video as well, again based on his prior interactions with him. While he admitted that he could not clearly see the face of the individual that he believed to be Branch-Samuels, he testified that other factors including his "gait, meaning the way he walks, his mannerisms, his height, build, his hair, who he was

associated with at the time of the incident, where he was at when it occurred," led him to believe that it was Branch-Samuels. *Id.* at 175. After Detective Messer testified that he recognized both Branch-Samuels and Yancey in the video, the court gave a cautionary jury instruction:

> The Court: Ladies and gentlemen, I'm going to give you a cautionary instruction at this point.
>
> You are the fact finders and it is your observation of the video which does prevail in this case. The testimony of Detective Messer is for the purpose of laying a foundation for you to understand what exactly the investigation was as a result of Detective Messer's input, but it is for you and you alone to determine rather what is reflected in the video.

*Id.* at 172-73.

Detective Emery testified that he did not know Branch-Samuels prior to the incident but did meet him during the course of the investigation. *Id.* at 221-22. During redirect examination, Detective Emery testified that he identified Branch-Samuels as "[t]he person in the two videos that I watched." *Id.* at 259-260. Defense counsel objected and the trial court sustained the objection, struck the testimony, and immediately gave a cautionary instruction:

> The Court: Sustained. That comment, that testimony will be stricken from the record. Once again, Ladies and Gentlemen, you are the sole judges of the facts. The witnesses can only testify as to what they did during the course of the investigation, why they did it. It is up to you to determine from your own viewing of the evidence in the case whether the Commonwealth has met its burden of proof.

*Id.* At sidebar, defense counsel moved for a mistrial. The court denied the motion, concluding that it was "a fine line issue," but agreed to give a cautionary instruction:

> The Court: I understand your objection. The ruling that I made pretrial and the ruling that I continue to make is that the officers can testify about why they did what they did but they cannot take from the jury the ultimate determination of who the person was in the video. They can testify based on their viewing of that video as well as their investigation they took certain steps. So if this officer crossed the line, and I'm not 100 percent sure that he did, because the question was, if I recall it correctly, who was Andre Branch-Samuels. Because the question before that he asked and said that he arrested Mr. Cabbagestalk because he wasn't Andre Branch-Samuels, so I don't think the question was inappropriate. The answer may have crossed the line because it went from saying because we had an arrest warrant, because the basis for the arrest we had the video, we had the other information. So out of an abundance of caution I will instruct the jury to ignore it and move on. I will deny the motion for mistrial.
>
> [Defense Counsel]: One thing. It wasn't in that context of an arrest warrant at that point. He stated that Andre Branch-Samuels was in the video on April 1st but he didn't even know.
>
> The Court: You already made that argument. I have ruled that this is a fine line issue. That the detective cannot be precluded from explaining to the jury why they did what they did, including not arresting Mr. Cabbagestalk. But I have continued to caution the jury it is for them to determine who the individual was that did the shooting that appeared in the video, so I'm denying the mistrial.

*Id.* at 261-62.

Detective Emery testified that during a search of the Ford Focus, detectives discovered four shell casings "in the area of the wiper and down in below the wipers." *Id.* at 212-13. They also found a copy of the rental agreement for the vehicle in the vehicle. *Id.* at 266. The rental agreement

listed Jenea Price as the renter of the vehicle from March 26, 2016 through April 2, 2016, *i.e.*, including on the day in question.

Price testified that Branch-Samuels asked her to rent the vehicle to get to work and go to a birthday party. *Id.* at 386-87. The two went to Enterprise together, Price signed the rental agreement and listed Branch-Samuels as well as two other individuals on the paperwork as references. *Id.* at 267. Afterwards, Branch-Samuels drove the Ford Focus off the lot. Price also testified that on the day of the shooting, Enterprise contacted her to inform her that the vehicle was involved in a homicide.

Detective Emery testified that he recovered text messages from Price's phone, some of which had been deleted. *Id.* at 654-55. The deleted text messages were from conversations between Price and Branch-Samuels on the day of the homicide. *Id.* at 655, 657-58.[2] The detective testified that a text message Price received from an unsaved number on the day of the homicide read, "Yo, report that rental stolen." *Id.* at 659. Price then texted, "April Fools," to the number she had listed as Branch-Samuels' cell phone. Branch-Samuels responded, "Naw, I'm so serious." *Id.* at 660.

---

[2] These messages were marked as Commonwealth's Exhibit 89. However, this exhibit was not included in the certified record so we are unsure which messages that were read into the record were deleted messages. *See* N.T., at 653. ("All the ones that are highlighted in yellow were ones that were deleted from the actual phone").

Michelle Contis testified that she had a "professional" relationship with Branch-Samuels. She testified that prior to March 2016, he had long dreadlocks. *Id.* at 378. However, when she saw him on April 20, 2016, he had short hair. *Id.* at 379.

During closing argument, the Commonwealth presented a zoomed-in version of Exhibit 40, the video of the Focus in the parking lot. Defense counsel objected and the following was discussed at side-bar:

> The Court: Ms. Page [Assistant District Attorney], is it the same vantage point as what was shown, the same video, the video that Detective Emery received from Elmore Square and that you produced in discovery in this case?
>
> [ADA]: Yes, Your Honor. It is the exact same video but zoomed-in. The disc that was entered into evidence, Commonwealth's Exhibit 40, has Detective Emery's original handwriting on it, it has the original case number and all identification markers that he uses to mark the CDs. For purposes of, I guess this hearing or motion, whatever we want to call it, I placed the original 40 into the computer. It's the exact same information, it is the exact same video only zoomed-in utilizing the technology given to Mr. Haber.
>
> The Court: I'm going to let her play it.
>
> [Defense Counsel]: Judge, can I please argue this further? This is what happened. The Commonwealth provided in discovery the Elmore Square video. That's the one they played for the jury. That's the one they entered into chain of custody through Captain Appel.
>
> The Court: And that's the one that the detective signed, that's the one played for the jury.
>
> [Defense Counsel]: Correct. The one they're playing now was a separate disc given to me in discovery. It was enhanced. And I sat here through the entire trial wondering why aren't they playing the enhanced video. There are still photos on here. There's the zoomed-in Sandusky, zoomed-in Elmore, and I'm sitting there

thinking why aren't they entered that exhibit. I was waiting to object to it or at least argue or at least question whoever they were to enter it in through so that I could determine if there was a proper foundation laid for what was done to the video. The Commonwealth can't after the close of evidence and in closing show a video that the jury hasn't already seen that is zoomed-in without the jury hearing how or me having an opportunity to question how they went about zooming in. What was used? What technology did you use, did it change?

The Court: No, Mr. Haber, I disagree. This is, in fact, the disc that was provided to you and not a separate disc that has videos from both Elmore Square and Sandusky Square and still photos. This is not that discs, it was played for the jury. The case law indicates that the Commonwealth may highlight videos and technology does allow them to zoom in and what she has done, according to her representation, has zoomed-in on Exhibit 40.

N.T., at 765-67. Thus, the trial court allowed the Commonwealth to present the zoomed-in version of the video.

The jury found Branch-Samuels guilty of the above referenced offenses. At a later date the trial court sentenced him to life without parole, with a consecutive sentence of 40 to 80 months' incarceration for the firearms conviction, and no further penalty for the tampering with evidence conviction. Branch-Samuels filed a post-sentence motion, which the trial court denied. This timely appeal followed.

Branch-Samuels raises the following issues:

1. Was [Branch-Samuels] denied a fair trial when, in his closing summation to the jury, the prosecutor relied upon evidence dehors the record, when he played for the first time an enhanced portion of a surveillance video to prove identity?

2. Was [Branch-Samuels] denied a fair trial when the trial court allowed a police officer to speculate as to the identity of a person in a surveillance video whose facial features were

obscured based on the Officer's alleged familiarity with [Branch-Samuels'] gait and mannerisms?

3. Was [Branch-Samuels] denied a fair trial where the trial court refused to grant a mistrial when a police officer with no prior familiarity with [Branch-Samuels] identified him in surveillance videos where the facial features of the person on the videos were obscured?

Branch-Samuels' Br. at 8.

First, Branch-Samuels claims that, in violation of due process, the trial court allowed the Commonwealth to present "new evidence" during closing argument by "[p]laying the enhanced version" of Exhibit 40. *Id.* at 15. He maintains "[t]he zoomed-in version of the video was prohibited under [***Commonwealth v.***] ***Wise*** [444 A.2d 1287 (Pa.Super. 1982)] because it was not played during the Commonwealth's case." *Id.* at 17. He also argues that ***Commonwealth v. Lilliock***, 740 A.2d 237 (Pa.Super. 1999), supports his argument that the zoomed-in version of the video should have been considered new evidence.

In ***Wise***, the Commonwealth distributed photographs to the jury during its closing argument that had previously been introduced into evidence. 444 A.2d at 1290. This Court held "that counsel may reasonably display exhibits which are in evidence and may use such exhibits demonstratively as long as the demonstration is for illustration purposes and does not constitute the creation of new evidence." *Id.*

In ***Lilliock***, both parties presented photographs to the jury using "a video machine that enlarges a regular photograph on a video monitor." 740

A.2d at 243. This Court held that the trial court properly allowed the jury to use a magnifying glass to view the photographs during deliberations because the magnifying glass allowed "the jury to view the photographs in the same manner as they were presented during trial" and "assisted the jury in its truth-determining process." ***Id.***

Here, the trial court concluded that the zoomed-in version of the video was not new evidence because "the magnified image assisted the jury in determining the truth." Trial Court Opinion (TCO), filed 08/06/18 at 4. We disagree because neither the prosecution nor the defense presented the video in a zoomed-in fashion during trial. It therefore was not presented "in the same manner" as it was presented at trial. ***Lilliock***, 740 A.2d at 243. However, no relief is due because the error was harmless.

We may affirm notwithstanding a trial court's error in a criminal case if we conclude beyond a reasonable doubt that the error was harmless. ***Commonwealth v. Rasheed***, 640 A.2d 896, 899 (Pa. 1994). An error may be harmless in one of three ways: (1) it did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was cumulative of other, substantially similar evidence; or (3) there was other uncontradicted evidence of the defendant's guilt such that the error "could not have contributed to the verdict." ***Commonwealth v. Fulton***, 179 A.3d 475, 493 (Pa. 2018) (quoting ***Commonwealth v. Burno***, 154 A.3d 764, 787 (Pa. 2017)). The Commonwealth bears the burden of proving harmless error. ***Id.***

The Commonwealth maintains that any error in presenting the zoomed-in version of Exhibit 40 was harmless because extensive, properly admitted evidence connected Branch-Samuels to the white Ford Focus. This evidence includes:

- The rental agreement for the Focus that listed Branch-Samuels as a reference;

- Price's testimony that she rented the Focus for Branch-Samuels' use;

- Price's testimony that Branch-Samuels accompanied her to Enterprise and drove off in the Focus after she signed the rental agreement;

- Branch-Samuels' text message to Price texting her to report the rental as stolen.

**See** Commonwealth's Br. at 24-25. It maintains that this evidence showed that "Branch-Samuels' connection to the Focus is indisputable" and therefore the video "added little, if anything, to the proof that Branch-Samuels was the person who shot Dontae Thompson." **Id.** at 25.

We agree. Here, the Commonwealth's evidence, though circumstantial, was sufficient to prove that Branch-Samuels was involved in the shooting. **See Commonwealth v. Hutchinson**, 947 A.2d 800, 806 (Pa.Super. 2008) (stating Commonwealth may sustain it burden "by means of wholly circumstantial evidence"). While no witness identified Branch-Samuels as the shooter, he was listed as a reference on the rental agreement for the white Ford Focus. Additionally, Yancey, who was at least an associate of Branch-Samuels, gave officers the keys to the white Ford Focus. Moreover, on the day

of the shooting, Branch-Samuels told Price to report the rental as stolen. Further, Branch-Samuels cut his dreadlocks sometime after the shooting, which was evidence of his consciousness of guilt. *See Commonwealth v. Brown*, 676 A.2d 1178, 1183 (Pa. 1996) (holding jury can infer consciousness of guilt where defendant intentionally alters physical appearance).

All the above evidence linked Branch-Samuels to the shooting, making any prejudice from the zoomed-in version of the video "so insignificant by comparison that the error could not have contributed to the verdict." *Fulton*, 179 A.3d at 493. The introduction of the video was harmless error.

Next, Branch-Samuels maintains that the trial court erred in allowing Detective Messer's allegedly "speculative" identification of Branch-Samuels as the male in Exhibit 40. Branch-Samuel's Br. at 26-27. He argues that the trial court should have limited Detective Messer's testimony to his reasons for investigating Branch-Samuels, and should not have allowed him to identify Branch-Samuels in the video.

We review a challenge to the admissibility of evidence for an abuse of discretion. *See Commonwealth v. Belknap*, 105 A.3d 7, 9 (Pa.Super. 2014). An abuse of discretion "exists where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Commonwealth v. Christine*, 125 A.3d 394, 397 (Pa. 2015) (quoting *Commonwealth v. Bryant*, 67 A.3d 716, 726 (Pa. 2013)).

At the hearing on the motion to exclude Detective Messer's testimony, the trial court relied on this Court's decision in *Brown* and ruled that Detective Messer could testify as to how he was able to identify Branch-Samuels as one of the males in the video. In *Brown*, the defendant was charged in a shooting death, and at trial, the Commonwealth introduced into evidence a surveillance video of the shooting. The trial court allowed the investigating detective in his testimony to describe images on the video and to call the jury's attention to specific portions of the video. However, it sustained an objection to the detective identifying particular persons in the video, and instructed the jury members that their observations controlled. We concluded that the trial court had ruled properly as to both issues. *Brown*, 134 A.3d at 1106. Regarding the identification testimony, because of the lack of foundation, we concluded that the testimony would have been "speculative." *Id.*

Here, after the prosecutor showed the jury Exhibit 40, Detective Messer testified that he was able to identify Branch-Samuels in the video from his past experience with him, specifically noting "his gait, meaning the way he walks, his mannerisms, his height, build, his hair" as identifying traits. N.T., at 175. The trial court in its opinion stated that it allowed this testimony because it was relevant because "it both explained the next steps taken and completed the picture of events that followed." TCO at 5.

The trial court acted within its discretion in allowing Detective Messer's testimony. Notably, in line with our decision in *Brown*, here the court

prohibited Detective Messer from telling the jury "while they are watching the video, this is Mr. Branch-Samuels." N.T., Pretrial Motions Hearing, at 9-10. Detective Messer's testimony was based upon his past experience with Branch-Samuels, his perception of the video, and allowed the jury to put the detective's further actions in context. *See Commonwealth v. Palmer*, 192 A.3d 85, 100-01 (Pa.Super. 2018) ("Testimony about the video[] was based upon [detective's] perception of [it], placed his subsequent actions in context, and was helpful in allowing the jury to reach a clear understanding of all his testimony").

Nor did the court err in allowing Detective Messer to explain to the jury that he began investigating Branch-Samuels after viewing the video. Moreover, when Detective Messer testified that he identified Branch-Samuels as the male in Exhibit 40, the trial court gave a cautionary instruction that "their own observations controlled" in determining the identity of the individuals in Exhibit 40. *See Brown*, 134 A.3d at 1106; *see also Palmer*, 192 A.3d at 101 ("The jury itself watched the videos, and was free to reach a different conclusion if it disagreed" with detective's testimony.).

Last, Branch-Samuels argues that the trial court abused its discretion by failing to grant his request for a mistrial after Detective Emery testified that he identified Branch-Samuels in both videos. Our standard of review of the denial of a mistrial is as follows:

> The trial court is in the best position to assess the effect of an allegedly prejudicial statement on the jury, and as such, the grant

- 15 -

or denial of a mistrial will not be overturned absent an abuse of discretion. A mistrial may be granted only where the incident upon which the motion is based is of such nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. Likewise, a mistrial is not necessary where cautionary instructions are adequate to overcome any possible prejudice.

*Commonwealth v. Johnson*, 107 A.3d 52, 77 (Pa. 2014) (quoting *Commonwealth v. Rega*, 933 A.2d 997, 1016 (Pa. 2007)).

During redirect examination, Detective Emery testified that Branch-Samuels was depicted in Exhibits 23 and 40. Following counsel's objection, the trial court sustained the objection, struck the testimony, and immediately gave a cautionary instruction to the jury:

> The Court: Sustained. That comment, that testimony will be stricken from the record. Once again, Ladies and Gentlemen, you are the sole judges of the facts. The witnesses can only testify as to what they did during the course of the investigation, why they did it. It is up to you to determine from your own viewing of the evidence in the case whether the Commonwealth has met its burden of proof.

N.T. at 259-60. This curative instruction was "adequate to overcome any possible prejudice." *Johnson*, 107 A.3d at 77. The court's actions in not only providing a curative instruction but also sustaining the objection and striking the testimony, sufficiently eliminated any prejudice such that a mistrial was not required. It did not abuse its discretion in denying the motion for a mistrial.

Judgment of sentence affirmed.

President Judge Panella joins the memorandum.

Judge Stabile concurs in the result.

J-A08036-19

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date:  7/26/2019